PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ISIDRO GOMEZ; LINDA L. GOMEZ,
Wife,

*Plaintiffs-Appellees,*

v.

W. J. ATKINS, in his official and
individual capacity,

*Defendant-Appellant,*

and

EARL MOOSE BUTLER, Sheriff of
Cumberland County, in his official
and individual capacity; H. R.
COLLINS, in his official and
individual capacity; JERRY D.
WEBSTER, in his individual capacity;
WESTERN SURETY COMPANY; DEBRA
KOENIG,

*Defendants.*

No. 01-2112

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(CA-99-611-5-BR)

Argued: April 2, 2002

Decided: July 11, 2002

Before WILKINSON, Chief Judge, KING, Circuit Judge, and
HAMILTON, Senior Circuit Judge.

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Chief Judge Wilkinson and Judge Hamilton joined. Judge Hamilton wrote a separate concurring opinion.

---

**COUNSEL**

**ARGUED:** Reginald B. Gillespie, Jr., FAISON & GILLESPIE, Durham, North Carolina, for Appellant. Carl Wesley Hodges, II, SHIPMAN & ASSOCIATES, L.L.P., Wilmington, North Carolina, for Appellees. **ON BRIEF:** William C. Morgan, Jr., THE BROUGH LAW FIRM, Chapel Hill, North Carolina, for Appellant. Gary K. Shipman, SHIPMAN & ASSOCIATES, L.L.P., Wilmington, North Carolina, for Appellees.

---

**OPINION**

KING, Circuit Judge:

Appellee Isidro Gomez ("Isidro") initiated this proceeding in the Eastern District of North Carolina under the provisions of 42 U.S.C. § 1983. He contended that Sergeant W. J. Atkins of the Cumberland County Sheriff's Department (the "Sheriff's Department") violated his constitutional rights by causing him to be charged and arrested, without probable cause, for the murder of his wife. He also asserted various related state law claims. Sergeant Atkins sought summary judgment in the district court, claiming qualified immunity. When the court declined to recognize his immunity claim, he filed this interlocutory appeal. As explained below, we vacate and remand for dismissal.

I.

In July 1980, Rickie Jean Gomez, Isidro's first wife, was murdered in Fayetteville, North Carolina.[1] In the latter half of 1980, the Sher-

---

[1] In the record, Mrs. Gomez's name is spelled as either "Rickie" or "Ricki." Following the example of the parties and the district court, we utilize "Rickie," except when the alternative is present in quotations.

iff's Department conducted a lengthy investigation of the crime, but it bore no fruit and lapsed into inactivity (the "Initial Investigation"). The investigation of the unsolved homicide was resurrected in 1995, and a follow-up investigation (the "Follow-up") was conducted under the auspices of Sergeant Atkins. A few months later, in May 1996, Isidro, who had re-married in 1981, was charged with the murder of his first wife. Following proceedings in the Cumberland County District Court, Isidro was indicted for first degree murder. The indictment was subsequently dismissed, and this civil litigation ensued. The factual predicate for these proceedings is explained more fully below.

A.

In its Initial Investigation, the Sheriff's Department learned that Rickie Jean had married Isidro in 1968 and that the couple made their home in Fayetteville. By 1979, Isidro and Rickie Jean were experiencing marital problems and they were, at times, living separately. In July 1980, Isidro sought a reconciliation, and they met at her sister's home in Atlanta, Georgia, on Friday, July 11, 1980. At the end of the weekend, on July 13, 1980, Isidro and Rickie Jean departed Atlanta on their return to Fayetteville. After travelling only seven or eight miles, Isidro's vehicle broke down. Because the necessary repair parts were unavailable, Isidro asked a friend, James Horton, to pick them up and tow the car to Horton's home in an Atlanta suburb. Horton and his wife then invited the couple to spend the night, but Rickie Jean declined because she was scheduled to work in Fayetteville the next day. Thus, after dinner, Isidro and Horton transported Rickie Jean to the Atlanta airport, and she returned to Fayetteville by plane. Isidro spent Sunday evening in Georgia with the Hortons.

On Monday morning, July 14, 1980, Horton's wife took Isidro to obtain parts for the repair of his car. Isidro then made the necessary repairs and, between 10:00 and 10:30 a.m., he departed for Fayetteville. The distance between the Hortons' home near Atlanta and the Gomez home in Fayetteville is approximately 376 miles. At about 6:20 p.m., Rickie Jean's supervisor at Piedmont Airlines (her employer), called Isidro at the Gomez home, advising him that, although Rickie Jean had arrived in Fayetteville on a Sunday-evening flight, she had not reported for work Monday morning.

Around 7:00 p.m. on July 14, 1980, after consulting with a neighbor, Isidro called the local police and reported that Rickie Jean was missing. Law enforcement officers arrived at the Gomez home a few minutes later, and a crime scene investigation was conducted. There were no signs of robbery or forced entry into the home, but the investigators discovered blood in and around the master bedroom, a large blood stain on the underside of the mattress, and bloody shoe prints in the driveway. Upon removing the blood-soaked mattress from the bedroom, investigators noticed that Isidro was not distraught, and that he seemed unconcerned that his wife was missing and possibly dead. That evening, Isidro went to the County Law Enforcement Center to be interviewed.

At approximately 10:20 the next morning, July 15, 1980, deputies located Rickie Jean's car, with her dead body inside, in a wooded area about a mile from the Gomez home. She was wearing a nightgown, and the investigators found bed linen from the master bedroom in her car. An autopsy revealed that Rickie Jean had been badly beaten and stabbed in the chest. The time of her death was established as being six to thirty-six hours prior to the discovery of her body, i.e., between 10:00 p.m. on Sunday, July 13, and 4:00 a.m. on Tuesday, July 15, 1980.

During the Initial Investigation, Isidro provided the Sheriff's Department with blood and hair samples. Tests on the evidence found at the Gomez home revealed the presence of both Types O and A blood, the types of Rickie Jean and Isidro, respectively. Blood found under Rickie Jean's fingernails was the same type as Isidro's. Loose hairs found on Rickie Jean's body were "microscopically consistent" with Isidro's hair. Investigators also discovered that Rickie Jean had advised several of her friends that Isidro had previously subjected her to physical abuse and beatings, and that he had threatened to kill her.

Throughout his interviews with the Sheriff's Department, Isidro maintained that he had not arrived home in Fayetteville until 6:00 p.m. on July 14, 1980, and that Rickie Jean's car was not there when he arrived. Shortly thereafter, according to Isidro, he noticed small blood stains in the house. After receiving a phone call from Rickie Jean's supervisor, Isidro called friends and relatives in an effort to locate Rickie Jean. Then, upon going outside to the driveway, he first

noticed a large brownish stain which turned out to be blood. Isidro denied that he was involved in the death of Rickie Jean, maintaining that it was impossible for him to have returned from Atlanta in time to commit the murder and dispose of her body. On July 18, 1980, Isidro was subjected to a polygraph examination on the matter, which he failed.

After the Initial Investigation, no charges were brought in connection with the murder of Rickie Jean. In May 1981, ten months after the murder, Isidro married his current wife and, because of a job transfer, moved to Michigan. Due to subsequent transfers, Isidro and his new wife, Linda, moved to Kentucky and finally to Virginia. All the while, the homicide investigation of Rickie Jean's death remained pending and unsolved in the Sheriff's Department.

### B.

In 1994, fourteen years after the murder of Rickie Jean, Earl "Moose" Butler was elected Sheriff of Cumberland County. After taking office, Sheriff Butler directed Sergeant Atkins to review the County's unsolved homicide cases, including that of Rickie Jean. In November 1995, after reviewing the file on the Initial Investigation, Atkins travelled to Virginia and interviewed Isidro. Isidro relayed to Atkins essentially the same version of events he had provided the Sheriff's Department in 1980. Over the next six months, Atkins also interviewed relatives, friends, and co-workers of Rickie Jean, both in person and by phone. In all, he obtained the oral and written statements of at least seventeen persons. Numerous individuals advised Atkins that Rickie Jean claimed that Isidro had physically abused her, and that he had threatened to kill her. For example, Sabrina Ross, a friend of Rickie Jean, reported to Atkins that on one occasion Isidro "had choked [Rickie Jean], threw her on the floor and slapped her in the face," and that in a separate incident he "threw her against the wall and caused her to [miscarry] their first child." Ross also stated that Isidro repeatedly told Rickie Jean that he would kill her. Another witness informed Atkins about seeing bruises "around [Rickie Jean's] neck, her ribs, arms, and on her back." Additionally, her friends informed Atkins that Rickie Jean and Isidro were each engaged in extramarital love affairs. According to a person who spoke with Rickie Jean the night before she left to meet Isidro in Atlanta, she was

planning to tell him about a romantic relationship with another man. Atkins also learned that Rickie Jean and Isidro were engaged in a dispute over the custody of their two children. And one witness informed Atkins that Isidro had said "he would kill [Rickie Jean] before she got the kids."

In April 1996, at Atkins's request, Isidro provided new blood and hair samples to the Sheriff's Department, and it conducted DNA testing. The Laboratory Corporation of America ("LabCorp") then compared the DNA material found under Rickie Jean's nails with Isidro's DNA profile, but the results failed to inculpate Isidro (the "LabCorp DNA Report").

C.

Based on both the Initial Investigation and the Follow-up conducted in 1995 and 1996, Sergeant Atkins then drafted a six-page Statement of Investigating Officer in Detail (the "Report"), which purported to summarize the facts surrounding the death of Rickie Jean and the evidence pointing to Isidro as the culprit. The Report stated that loose hairs found on Rickie Jean were consistent with Isidro's body hair, and that blood found under Rickie Jean's fingernails was of the same type as Isidro's. After noting Isidro's contention that he did not return to Fayetteville until 6:00 p.m. on July 14, 1980, the Report observed that Isidro could have arrived earlier without exceeding the speed limit. Additionally, the Report recounted that Isidro and Rickie Jean were each engaged in extramarital affairs, and that there was an ongoing dispute between them over the custody of their children. Finally, it observed that Isidro failed to show remorse over his wife's death, and that he had failed the polygraph examination relating to the investigation.[2]

---

[2]Sergeant Atkins's Report also contained at least three material inaccuracies. First, it stated that Isidro's shoe size was the same as that found in a bloody footprint in the driveway at the crime scene. Second, it asserted that witnesses had spoken with Isidro in Fayetteville at 3:00 on Monday afternoon, when the witness statements from the Initial Investigation indicated that the first such conversation occurred at 6:20 p.m. Third, relying on statements of officers who had travelled from Atlanta to Fayetteville, the Report stated that the drive could be completed in four-and-a-half to five hours without exceeding the speed limit, when in fact the trip would take approximately seven hours without speeding.

On May 14, 1996, Sergeant Atkins met with his supervisors and the legal advisor for the Sheriff's Department (attorney Deborah Koenig), for the purpose of discussing the homicide investigation and how he should proceed with it.[3] Atkins reviewed with them the evidence from the Initial Investigation and the additional evidence acquired in the Follow-up. He had concluded that there was sufficient evidence to charge Isidro with the murder of Rickie Jean, and his supervising officers and the legal advisor agreed.

Before seeking an arrest warrant for Isidro, Sergeant Atkins prepared an affidavit, in which he stated that "based upon the original investigation in 1980 and upon the continuing investigation from 1995 to 1996," Isidro "caused the death of his wife Ricki Jean Gomez." Prior to executing his affidavit, Atkins reviewed its contents with attorney Koenig, who responded that "it look[s] good to me." Atkins then presented the affidavit to a magistrate in the Cumberland County District Court, seeking issuance of an arrest warrant. The magistrate, on May 14, 1996, issued a murder warrant for Isidro, based on the "information furnished under oath," and Isidro was arrested at his home in Chesterfield, Virginia. He was then transported to Cumberland County, and on May 24, 1996, he was released on bond.

### D.

After being arrested for the murder of his wife, Isidro retained lawyer Bobby Deaver of Fayetteville as his counsel. At a two-day probable-cause hearing conducted in the district court in September 1996, the issue of probable cause was litigated.[4] In support thereof, the prosecution presented the testimony of six witnesses, photographs

---

[3]Sheriff Butler was not present at the meeting, but the Chief Deputy, Chief Detective, and other supervising officers from the Sheriff's Department attended.

[4]The conduct of a probable-cause hearing in North Carolina is governed by N.C. Gen. Stat. § 15A-606(a). The purpose of such a hearing is "to determine whether the accused should be discharged or whether sufficient probable cause exists to bind the case over to superior court and to seek an indictment against the defendant." *State v. Sellars*, 278 S.E.2d 907, 913 (N.C. Ct. App. 1981).

of the blood evidence found in the driveway and master bedroom of the Gomez home, as well as the autopsy report and its accompanying photographs. One of the two testifying law officers read Isidro's July 15, 1980, statement into the record, spelling out Isidro's version of the events. During the hearing, attorney Deaver cross-examined the State's witnesses and, in response to the State's case, he presented evidence on behalf of Isidro, consisting of a statement by an alibi witness and the exculpatory LabCorp DNA Report. At the conclusion of the hearing, on September 27, 1996, the district court found "there is probable cause to believe that Ricki Jean Gomez was murdered on or about the 14th day of July, 1980, and that there is probable cause to believe that the defendant, Isidro Gomez, committed that offense of murder in the first degree." The next month, the district attorney sought, and the grand jury returned, a single-count indictment against Isidro, charging him with first degree murder in the death of Rickie Jean.

Following the indictment, while Isidro was on bond, the State's position on his case changed. In October 1996, LabCorp conducted additional DNA tests on fingernail scrapings from Rickie Jean, and it was determined that Isidro was "excluded as a possible contributor to the genetic material in this sample." Thereafter, the Sheriff's Department submitted Isidro's hair sample and loose hairs found on Rickie Jean's body to the FBI Laboratory. In its Report of September 30, 1997, the FBI determined that the hairs examined and compared were microscopically dissimilar, and it also concluded that some of the loose hairs on Rickie Jean's body, initially believed to belong to Isidro, were carpet fiber. Faced with the burden of proving Isidro's guilt beyond a reasonable doubt, the district attorney concluded that there was "insufficient evidence to continue the prosecution" and, on January 13, 1998, he dismissed the indictment. No further charges have been preferred.

### E.

On September 10, 1999, Isidro and Linda Gomez filed this § 1983 suit against Sergeant Atkins, Sheriff Butler, and certain other officers, in both their official and individual capacities.[5] Their Complaint

---

[5]In addition to Sergeant Atkins and Sheriff Butler, the Complaint named the following as defendants: Detective Sheriff H.R. Collins of the

alleged, inter alia, that Atkins and Butler had violated Isidro's Fourth Amendment right to be free from unreasonable seizure. Isidro's present wife, Linda Gomez, sought damages for loss of consortium.

On November 17, 2000, Sergeant Atkins and Sheriff Butler filed a joint motion for summary judgment, maintaining that they were entitled to qualified immunity for their actions in the investigation and arrest of Isidro. Conversely, Isidro asserted that qualified immunity was inappropriate because, after considering his alibi and correcting the errors in Atkins's Report, no reasonable officer could believe there was probable cause to arrest him. On December 27, 2000, Isidro dismissed all the claims against Butler in his individual capacity, rendering Butler's claim of qualified immunity moot. On August 27, 2001, the district court issued its Order denying Atkins's qualified immunity claim. *Gomez v. Butler*, Order, No. 5:99-CV-611-BR(2) (E.D.N.C. Aug. 27, 2001) (the "Order"). The court concluded, inter alia, that the evidence was insufficient to establish probable cause to charge Isidro and that "a reasonable officer could not have believed that there was probable cause to seek an arrest warrant under the circumstances." *Id.* at 17. Atkins then appealed to this Court from the denial of his immunity claim, and, on September 20, 2001, the district court proceedings were stayed pending our review of his claim. We possess jurisdiction pursuant to the collateral order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Wadkins v. Arnold*, 214 F.3d 535, 536 n.1 (4th Cir. 2000).

## II.

We review de novo a district court's denial of qualified immunity. As a general proposition, in assessing a qualified immunity claim, a

---

Cumberland County Sheriff's Department, Jerry D. Webster of the North Carolina State Bureau of Investigation, and Western Surety Company. An Amended Complaint, filed July 17, 2000, named Ms. Koenig, the legal advisor, as a defendant. The plaintiffs thereafter dismissed Collins, Webster, and Koenig. They did not sue the district attorney, the magistrate, the district court judge, or the grand jury. *See Wadkins v. Arnold*, 214 F.3d 535, 538 n.5 (4th Cir. 2000) (explaining that judicial officers acting in their judicial capacities and prosecutors authorizing prosecution are protected by absolute immunity).

court must view the facts in the light most favorable to the party asserting the injury. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). As such, to the extent that there is a factual dispute concerning what Sergeant Atkins knew after conducting his Follow-up investigation, we must resolve any such dispute in the light most favorable to Isidro. However, to the extent that Atkins decided to discount certain conflicting evidence, such as Isidro's alibi, we need not accept such discounted evidence in the light most favorable to him. Were we compelled to accept an alibi that a law officer has declined to credit, the officer could never be deemed to have acted reasonably, and we would eliminate any possibility of qualified immunity in a § 1983 case. Instead, as we explain more fully below, to the extent that Atkins discounted Isidro's alibi or interpreted certain evidence, our review must assess whether, in so doing, he acted in an objectively reasonable manner, i.e., whether an objective officer could have reasonably believed there was probable cause for an arrest. *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991).

III.

A.

Public officials engaged in the performance of discretionary functions are entitled to qualified immunity from civil liability to the extent "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001). The Supreme Court has recognized that such immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In particular, as we have spelled out with specificity, qualified immunity protects law officers from "bad guesses in gray areas," and it ensures that they may be held personally liable only "for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

In an appeal from the denial of a qualified immunity claim, our first task is to ascertain whether the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Clem v. Corbeau*, 284 F.3d 543, 549 (4th Cir. 2002). If the answer to

this inquiry is "no," the analysis ends and the plaintiff cannot prevail. If the answer is "yes," we must then consider whether, at the time of the violation, the constitutional right was clearly established, that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201-02; *see also Taylor v. Waters*, 81 F.3d 429, 433 (4th Cir. 1996) (quoting *Gordon v. Kidd*, 971 F.2d 1087, 1093 (4th Cir. 1992)).

### B.

The § 1983 claim being pursued by Isidro is, in substance, that Sergeant Atkins violated his Fourth Amendment right not to be arrested without probable cause. Isidro contends that, in seeking the arrest warrant, Atkins ignored exculpatory evidence and made false statements in support of the warrant application. Isidro maintains that Atkins sought the arrest warrant despite the fact that there were no indicia of probable cause, and he further maintains that Atkins's misstatements initiated the improper prosecution. In our assessment of whether Atkins is entitled to qualified immunity, however, the question is not whether there actually was probable cause for the murder warrant against Isidro, but whether an objective law officer could reasonably have believed probable cause to exist. *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991). As the Supreme Court stated in *Malley v. Briggs*, "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." (citations omitted). 475 U.S. at 344-45. In *Anderson v. Creighton*, the Court set forth the underlying rationale for this favorable standard, observing that "[i]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . like other officials who act in ways they reasonably believe to be lawful[,] [they] should not be held personally liable." 483 U.S. 635, 641 (1987).

### C.

In assessing whether probable cause existed when the murder warrant against Isidro was issued, we must "examine the totality of the circumstances known to the officer at the time of the arrest." *Taylor*, 81 F.3d at 434 (citing *United States v. Al-Talib*, 55 F.3d 923, 931 (4th

Cir. 1995)). We are guided in this endeavor by certain fundamental principles. First, the determination and existence of probable cause is a "practical, nontechnical conception," and it involves "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949). Furthermore, in determining whether probable cause exists, the evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

Probable cause will be found to exist when "the facts and circumstances within an officer's knowledge — or of which he possesses reasonably trustworthy information — are sufficient in themselves to convince a person of reasonable caution that an offense has been or is being committed." *Wadkins v. Arnold*, 214 F.3d 535, 539 (4th Cir. 2000) (citing *Brinegar*, 338 U.S. at 175-76). While probable cause demands "more than a mere suspicion, . . . evidence sufficient to convict is not required." *Taylor*, 81 F.3d at 434 (citing *Wong Sun v. United States*, 371 U.S. 471, 479 (1963)). And reasonable law officers need not "resolve every doubt about a suspect's guilt before probable cause is established." *Torchinsky*, 942 F.2d at 264 (citation omitted). While officers "may not disregard readily available exculpatory evidence . . . the failure to pursue a potentially exculpatory lead is not sufficient to negate probable cause." *Wadkins*, 214 F.3d at 541.

## IV.

In order for Sergeant Atkins to successfully claim qualified immunity in this case, the information within his knowledge at the time of the warrant application had to justify a reasonable belief that Isidro probably caused the death of Rickie Jean. Contrary to the conclusion of the district court, our assessment of the information connecting Isidro to the crime compels the view that the warrant application was not "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986). In the circumstances of the case, Atkins did not transgress any bright lines, *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), and to the extent he made mistakes, they are entirely insufficient to render him liable to a § 1983 action. *Torchinsky v. Siwinski*,

942 F.2d 257, 261 (4th Cir. 1991). Our analysis of the record here leads us inexorably to this conclusion. Isidro possessed a strong motive to harm or kill Rickie Jean; he had the opportunity to commit the crime; he was linked to the murder by physical evidence; and Atkins was entitled to disbelieve his alibi. From a procedural standpoint, Atkins acted in a prudent manner, and his view of the probable cause question passed muster in state court. We explain our analysis more fully below.

A.

1.

First, both the Initial Investigation and the Follow-up revealed that Isidro possessed a strong motive to injure Rickie Jean, and that he had made prior threats to both harm and kill her. *See Matter of Extradition of Kraiselburd*, 786 F.2d 1395, 1399 (9th Cir. 1986) (stating that "evidence of appellant's motive and threats amply supports a finding of probable cause"). Friends of Rickie Jean had informed Sergeant Atkins that both she and Isidro were engaged in extramarital affairs. According to a witness who spoke with Rickie Jean the night before she met Isidro in Atlanta, "she was going to tell [Isidro] about her relationship with [another man]."

Additionally, the Initial Investigation revealed, and Sergeant Atkins was advised by several witnesses, that Isidro had repeatedly physically abused and threatened to kill Rickie Jean. Isidro and Rickie Jean were engaged in violent disputes over who should have custody of their children, and Isidro had said "he would kill [Rickie Jean] before she got the kids." As those "versed in the field of law enforcement" well know, *see Illinois v. Gates*, 462 U.S. 213, 232 (1983), it is common for death threats to be made in domestic violence matters. Unfortunately, they are too often carried out, resulting in serious injury and death.

2.

Second, based on the information in the hands of Sergeant Atkins, Isidro possessed an ample opportunity to commit the brutal murder of

his wife. He had departed from Atlanta as early as 10:00 a.m. on July 14, 1980, and the police did not arrive at the Gomez home until after 7:00 that evening. Isidro thus had a nine-hour window, before calling the authorities, within which to travel from Atlanta to Fayetteville, kill his wife, and then dispose of her body. Indeed, he admits being at the murder scene by 6:00 p.m., at least an hour before he called the authorities.[6]

### 3.

Third, while it was not overly compelling, some of the available physical evidence linked Isidro to the crime. Although the LabCorp DNA Report concluded that material found under Rickie Jean's fingernails did not match Isidro's DNA profile, other blood evidence could be reasonably construed to connect Isidro to the crime. Rickie Jean had Type O blood, yet Type A blood (Isidro's type) was found in the master bedroom where she was murdered. More importantly, Type A blood was found under Rickie Jean's fingernails. And, at the time the warrant was issued, loose hairs found on Rickie Jean's body were determined to be microscopically consistent with Isidro's hair. Finally, investigators at the crime scene believed that Isidro had conducted himself in a strange manner, and that he had failed to express grief or remorse, despite the fact that his wife was missing and the evidence indicated that foul play had occurred.

### 4.

Fourth, Sergeant Atkins was entitled to disbelieve Isidro's alibi. And to the extent that the alibi was deemed false, it was also reasonable for Atkins to view it as inculpatory. *See United States v. Mojica-Baez*, 229 F.3d 292, 306 (1st Cir. 2000) (explaining that "false alibi was itself evidence of guilt"). In both 1980 and 1995, Isidro claimed that he drove no faster than the speed limit from Atlanta to Fayetteville, and that he did not arrive home until 6:00 p.m. on July 14. Thus, Isidro maintained that he did not have a sufficient opportunity to murder Rickie Jean and move her body before the authorities arrived in response to his 7:00 p.m. phone call. A reasonable officer, however,

---

[6]It is of additional significance that Rickie Jean was murdered in her own home, and that there were no signs of forced entry or robbery.

was not obliged to credit Isidro's exculpatory story. For example, if Isidro departed Atlanta at 10:00 a.m., and if he averaged sixty-five miles per hour, he could have stopped for fuel and still arrived in Fayetteville by 4:00 p.m.[7] Thus, Isidro could reasonably be placed at his home more than two hours before he claims to have arrived. And, although such results are generally not admissible in a criminal trial, Isidro had failed a polygraph examination in connection with his version of events.[8] Thus, an objectively reasonable officer was entitled to conclude that Isidro was providing the authorities with a false alibi.

### B.

It is important to our analysis that Sergeant Atkins conducted himself, from a procedural standpoint, in a prudent and deliberate manner. After carrying out his Follow-up investigation, he drafted a written Report and, before seeking judicial action against Isidro, he presented the case to his supervisors and the legal advisor of the Sheriff's Department. After receiving their supportive opinions, he provided his proposed affidavit to the Department's legal advisor for her review. It was only after following these "in-house" review procedures that Atkins presented the affidavit to the magistrate and sought the issuance of a murder warrant against Isidro. *See Wadkins v. Arnold*, 214 F.3d 535, 541-42 (4th Cir. 2000) (recognizing that officer's "conference with the Commonwealth's Attorney and the subsequent issuance of the warrants by a neutral and detached magistrate weigh heavily toward a finding that [officer] is immune").

---

[7]In order to drive from Atlanta to Fayetteville, Isidro took Interstate 20 East to Florence, South Carolina, and then proceeded North on Interstate 95, a distance of approximately 376 miles. If he drove at the then fifty-five mile per hour speed limit, the trip would have taken about seven hours, placing him in Fayetteville as early as 5:00 p.m. If he averaged seventy miles per hour, however, he would have completed the trip in less than five-and-a-half hours, and he would have been home in Fayetteville prior to 3:30 p.m.

[8]While polygraph results are generally not admissible at trial, such tests are a well-recognized law enforcement technique, and a reasonable officer might take their results into account in assessing probable cause. *See United States v. Trenkler*, 61 F.3d 45, 58 (1st Cir. 1995) (recognizing that law enforcement officers rely on polygraph examinations even though they are generally not admissible).

In our assessment of objective reasonableness, it is also significant that Atkins arrested Isidro only after first seeking and procuring the approval of a detached district court magistrate. This was the proper course of action on his part. As Chief Judge Wilkinson astutely observed in our *Torchinsky* decision, while the issuance of an arrest warrant does not provide per se evidence of objective reasonableness, a law officer's "actions in seeking [an] arrest warrant[ ] and the magistrate's determination of probable cause provide additional support for his claim that he acted with objective reasonableness." *Torchinsky*, 942 F.2d at 262.

## C.

Finally, and perhaps of most significance to our assessment of Sergeant Atkins's qualified immunity claim, we must take account of the comprehensive probable-cause hearing conducted on the murder charge made against Isidro. During the two-day hearing in September 1996, the district court judge heard and evaluated the testimony of the State's six witnesses, all of whom were cross-examined by Isidro's retained counsel. One of the witnesses read Isidro's July 15, 1980, statement, containing his version of the events, to the judge. During the hearing, the prosecution presented photographic and medical evidence relating to the crime, and Isidro's counsel countered with an alibi statement and the exculpatory LabCorp DNA Report. After reviewing and considering this evidence and the argument of counsel, the judge reached the same conclusion as had the magistrate, finding "that there is probable cause to believe that the defendant, Isidro Gomez, committed that offense of murder in the first degree," and the court bound Isidro over for grand jury proceedings. And following the court's probable-cause ruling in favor of the prosecution, the district attorney successfully secured an indictment from the Cumberland County grand jury, charging Isidro with the first degree murder of Rickie Jean Gomez.

The district court, in denying Sergeant Atkins's qualified immunity claim, placed substantial reliance on the errors found in his Report, *see supra* note 2, and it emphasized the potential that those with whom Atkins dealt may have been misled by the Report.[9] Order at 12-

---

[9]According to Sergeant Atkins, he provided his Report to the magistrate, along with his affidavit, in seeking the arrest warrant. The Report

13. The probable-cause hearing, however, afforded Isidro a full opportunity to litigate, in an adversary proceeding before an impartial judge, the issue of probable cause. After the State presented its evidence, and after Isidro's counsel cross-examined the witnesses and introduced exculpatory evidence, the district court judge (who, not having reviewed the Report, could not have been influenced by any errors therein) found probable cause for the murder charge.

The Supreme Court, in *Malley v. Briggs*, emphasized that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." 475 U.S. 335, 341 (1986). In this case, Isidro has failed to forecast any evidence establishing that the Report was intentionally falsified by Sergeant Atkins. As we explained in *Torchinsky*, "[i]f reasonable mistakes were actionable, difficult questions of discretion would always be resolved in favor of inaction, and effective law enforcement would be lost." 942 F.2d at 261. The conduct complained of here fails to demonstrate either incompetence or a knowing violation of the law and, in these circumstances, Atkins's immunity claim must be recognized.[10]

V.

Pursuant to the foregoing, we vacate the Order of the district court, and we remand for dismissal.

*VACATED AND REMANDED*

---

was unsworn, however, and in issuing the warrant the magistrate relied only on information "furnished under oath." Nothing in the record indicates that the district court judge had access to or reviewed the Report prior to his finding of probable cause.

[10]Atkins also asserts that Isidro is collaterally estopped from asserting that there was no probable cause for his arrest, because that issue was fully litigated in the probable-cause hearing before the Cumberland County District Court. Because Atkins is entitled to qualified immunity, we need not address his collateral estoppel contention.

HAMILTON, Senior Circuit Judge, concurring:

For the reasons expressed by the court today, I agree with the court that Sergeant Atkins is entitled to qualified immunity because, notwithstanding the factual inaccuracies in Sergeant Atkins' report, an objective law enforcement officer reasonably could have believed that probable cause existed for the arrest of Isidro. Therefore, I join the court's opinion.

I write separately only to express my disdain for Sergeant Atkins' inclusion of the material factual inaccuracies, described in Footnote 2 of the court's opinion, in his report. These material factual inaccuracies, which dealt with the heart of the State's case, *i.e.*, whether Isidro murdered his first wife, should not have been in Sergeant Atkins' report. While the presence of these material factual inaccuracies in the report do not prevent Sergeant Atkins from invoking qualified immunity, it is nevertheless a disturbing commentary on the manner in which law enforcement activities are conducted in Cumberland County, North Carolina.