IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0551-10






WILLIAM THOMAS LEONARD, Appellant



v.



THE STATE OF TEXAS





ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE ELEVENTH COURT OF APPEALS


TARRANT COUNTY





 Keasler, J., filed a dissenting opinion, in which Keller, P.J., and Hervey,
J., joined.


DISSENTING OPINION 



 I dissent from the Court's opinion for two reasons: First, the Court creates an
unnecessary and unclear standard of review when evaluating a trial judge's revocation of
community supervision. Second, the Court firmly establishes a per se rule of exclusion for
polygraph examinations by permanently labeling polygraph examinations unreliable as a
matter of law. With one broad stroke, the Court closes the book on polygraph examinations
regardless of how they are used or the nature of the criminal proceeding in which they are
mentioned. The majority's inflexible approach incorrectly concludes that, in the limited
context of a community-supervision revocation proceeding in which the sole issue was
Leonard's discharge from court-ordered sex-offender treatment, a sex-offender-treatment
expert may never use polygraph-examination results to form an opinion about continued
treatment, even if those results constitute only a part of the basis for the opinion.

 We have long held that an abuse-of-discretion standard applies when reviewing a trial
judge's revocation of probation. (1) A trial court abuses its discretion by revoking probation
when the State has failed to prove a violation by a preponderance of the evidence. (2) Today,
the Court has created a new variant of the abuse-of-discretion standard because, in its view,
the time-tested standard is insufficient to protect against revocations based upon a
probationer's discharge from therapy for "a wholly inappropriate reason--such as illegal
discrimination or mere caprice." (3) The Court identifies this as a due process concern
necessary to this case's disposition, even though there is nothing in the record to suggest
Leonard was discharged for one of these reasons, nor does Leonard assert such a claim. To
remedy this perceived issue, the Court announces that appellate courts are required to
examine "the third party's use of discretion to ensure that it was used on a basis that was
rational and connected to the purposes of community supervision." (4) 

 This new standard is premised on an overly expansive view of due process in
revocation proceedings that we have never adopted and that is unsupported by United States
Supreme Court precedent. In Ex parte Carmona, a plurality of the Court relied upon the
Supreme Court's opinions in Gagnon v. Scarpelli (5) and Morrissey v. Brewer (6) and defined the
contours of due process in community-supervision revocations: "To meet the requirements
of due process, the final revocation must be preceded by a hearing where the probationer is
entitled to written notice of the claimed violations of his probation, disclosure of the evidence
against him, an opportunity to be heard in person and to present witnesses and documentary
evidence, a neutral body, and a written statement by the fact finder as to the evidence relied
on and the reasons for revoking probation." (7) Furthermore, if the trial judge finds a violation
of a condition of probation and has the discretion to continue the probation, due process 
provides the probationer "an opportunity to show not only did he not violate the conditions
[of his probation], but also that there was a justifiable excuse for any violation or that
revocation is not the appropriate disposition." (8) Having the opportunity to hear evidence from
both the State and the probationer, the trial judge as "the sole trier of facts, of the credibility
of the witnesses, and of the weight to be given to particular testimony at the hearing" can
accord varying weight to a witness's testimony or completely disregard it. (9) Moreover, the
trial judge has the discretion to continue a probationer's community supervision, revoke it,
or reduce the sentence after a violation has been proved. (10) Therefore, the potential for
revocation based on discharge from a treatment program for a "wholly inappropriate reason"
is tempered by the probationer's opportunity to justify the alleged reason for discharge, the
trial judge's discretion in evaluating the State's evidence, and, if found true, the trial judge's
wide latitude in crafting an appropriate disposition. I do not find any authority, nor does the
majority cite any, supporting the Court's conclusion that our current abuse-of-discretion
standard is inadequate. 

 Aside from whether due process requires a new standard of review, the Court's new
standard is vague and fails to provide sufficient guidance to the lower courts. In addition to
being rational, the third party's use of discretion must now be "connected to the purposes of
community supervision." With its citation to Texas Code of Criminal Procedure Article
42.12, § 11, the majority's opinion is unclear how the standard should operate. Does an
appellate court have to determine that the third party's use of discretion was "designed to
protect or restore the community, protect or restore the victim, or punish, rehabilitate, or
reform the defendant" like Article 42.12, § 11 requires of any condition imposed by a trial
court? (11) But Article 42.12, § 11 clearly gives the trial judge the exclusive authority to impose
conditions of probation to achieve these goals. By entrusting treatment decisions to a third
party, a trial court does not abandon this authority, nor does it impermissibly permit another
to unilaterally impose new ones. Or must a reviewing court now automatically question
whether the condition of probation requiring the successful completion of treatment is a
reasonable condition designed to meet these goals? And must this review occur regardless
of an objection to the condition's imposition or whether actually raised on appeal? Assuming
a new standard of review is required for revocations based on treatment decisions of a third
party, it should be one that is clear and informs the lower courts how to implement it.

 Turning to Leonard's probation-revocation hearing, George Strain, Leonard's treating 
psychotherapist, testified that he terminated Leonard's treatment resulting in an alleged
violation of a condition of his probation--the successful completion of sex-offender
treatment. Strain testified that he discharged Leonard because he believed Leonard was
being dishonest in the course of his treatment. He further testified that, "It's important for
me to feel that they're telling me the truth, that they're doing the things they're supposed to
do so they're not putting children at risk." Although there were times Leonard kept secrets
and had not been completely honest about things which were discovered outside of the
polygraph examinations, Strain testified that his opinion about Leonard's dishonesty was
primarily based on Leonard's five failed polygraphs. He also testified that polygraph
examinations are a normal part of sex-offender treatment and that experts in the field,
including himself, reasonably rely upon the results in forming their opinions. Strain stated
he uses polygraphs as a way of gauging a person's compliance with their treatment contract
and the conditions of their probation. He also stated that polygraphs are used as a tool in
making treatment decisions and are used to determine whether the person is being honest
about their offense, their history, and their assurances of avoiding children, which if not
genuine, could pose a community-safety risk. The inability to form opinions from polygraph
results would, according to Strain, greatly decrease a therapist's ability to provide sex-offender treatment.

 Addressing the admissibility of Strain's testimony, the Court relies upon our line of
cases broadly pronouncing polygraph results inadmissible to conclude that polygraph results
are unable to form even a part of the basis of a sex-offender-therapist's expert opinion. But
our past statements concerning polygraph results do not aptly apply to the present case like
the majority presumes. The breadth of the Court's holding today is alarming in that it
suggests that in any future proceeding, polygraph results--regardless of the context in which
they may be considered or the purpose for which they may be proffered--will never be
permissible as a matter of law. However, a number of federal circuit courts have either
abandoned or never adopted a per se rule of inadmissibility. (12) While we have stated "[t]he
existence and results of a polygraph examination are inadmissible for all purposes" (13) and are
not admissible in a Texas criminal proceeding, (14) we have never addressed whether (1) the
use of polygraph results were improper in a therapy context or a revocation proceeding or (2)
whether an expert could rely on the results to render an opinion on a probationer's
compliance with court-ordered therapy. 

 Though revocation hearings bear some similarity to trials, they are distinct in that
there is no jury, no finding of guilt, and the burden of proof by which a violation of probation
must be proven is a preponderance of the evidence as opposed to beyond a reasonable doubt. 
Unlike a trial, a probation-revocation hearing is neither criminal nor civil in nature. (15) 
Romero v. State--the authority upon which the majority heavily relies--and the cases
decided before it, all involved the polygraph's reliability in relation to jury trials deciding
whether a defendant was guilty. (16) The unmistakable undercurrent of our previous cases has
been a concern regarding the indelible hold polygraph results tend to have on jurors; a
concern that does not exist in an adjudication or revocation proceeding where there is no
finding of guilt or a jury to unduly influence. In the litany of cases the Court describes
dealing with polygraphs, not one evaluated the polygraph's reliability in a therapy context
or in a revocation proceeding. Yet the Court grafts our sweeping holdings to a factually and
legally distinct situation. Therefore, our previous cases deeming polygraph results unreliable
are inapposite to the limited application of polygraph results in the present case, and do not
warrant a holding that forecloses the possibility of future admissibility or limited use of
polygraph results in all future proceedings.

 Furthermore, unlike some of our past cases, the polygraph results that Strain relied
upon were not introduced to show the truth or falsity of a particular answer. The issue was
not whether Leonard lied on any particular occasion or in response to a given question, but
whether he was generally being honest during the course of his treatment. The polygraph
results were offered to explain why Strain believed that Leonard was being dishonest, that
such a determination was rational, and that discharging Leonard from treatment was not an
arbitrary decision. (17) 

 Texas Rule of Evidence 703 permits an expert to base his or her testimony on facts
or data that may be inadmissible in evidence, "[i]f of a type reasonably relied upon by experts
in the particular field in forming opinions or inferences upon the subject." (18) Strain's
testimony that experts in his field rely on polygraph results to form opinions about an
individual's sex-offender treatment satisfied Rule 703's reasonable-reliance standard. In
addition, the treatment and practice standards adopted by the Council on Sex Offender
Treatment ("Council")--which may be imposed as a probation condition under Texas Code
of Criminal Procedure article 42.12, § 11(i)--further support Strain's assertion that
polygraphs are reasonably relied upon by experts in the field of sex-offender therapy. The
Legislature created the Council to "develop treatment strategies for sex offenders . . . [and]
set standards for treatment of sex offenders that must be met by sex offender treatment
providers . . . . (19) Through its adopted standards of treatment, the Council has affirmatively
endorsed the use of polygraph examinations in the course of treatment and on-going
evaluation as well as the polygraph's reliability in the sex-offender treatment context. (20) 
These standards of treatment corroborate Strain's testimony that polygraphs are used to
gauge a person's compliance with a treatment plan, advance the goals of therapy, and ensure
community safety. If polygraph examinations were not sufficiently valuable and reliable for
sex-offender treatment, it is reasonable to assume that the Council would not require licensed
therapists to use them in the course of treatment. 

 We have previously held that the use of the polygraph is a proper means of
investigation. (21) Polygraphs are commonly used as investigative tools and are "not used to
gather possible evidence for use during a trial, but solely to serve as a catalyst for further
investigation. (22) In his brief, Leonard concedes that polygraphs are valid investigative tools
and therapeutic aids that may be used. (23) Polygraphs in the sex-offender therapy context serve
an investigative function in that they assist therapists in their determination of whether a
probationer is complying with treatment and progressing and in that they enable therapists
to discover antecedents to reoffending. (24)

 Although not addressed by the court of appeals's or this Court's opinions, Strain
provided an additional basis for his conclusion that Leonard was being dishonest apart from
his reliance on the failed polygraph examinations. Strain testified that, "There had been
times that Mr. Leonard has kept secrets and not been completely honest about things, and
those have come out in polygraphs which is not part of the results of the polygraphs." While
Strain stated he primarily relied on the polygraph results, discovering that Leonard was
keeping secrets without the use of the polygraph's results is alone a rational basis for Strain
to conclude Leonard was being dishonest and required Leonard's discharge from treatment.

 I disagree with the Court's overly broad holding that polygraphs can never be reliable 
or reasonably relied upon to form an expert opinion. I would hold that the trial judge did not
abuse her discretion in adjudicating Leonard because Strain (1) learned Leonard was keeping
secrets without the use of polygraph results, and (2) properly relied upon Leonard's failed
polygraph examinations in concluding that Leonard was being dishonest which warranted
Leonard's discharge from treatment. Because the Court does not so hold, I dissent.


DATE FILED: November 21, 2012

PUBLISH



 
1. Rickels v. State, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006); Cardona v. State,
665 S.W.2d 492, 493 (Tex. Crim. App. 1984); Caddell v. State, 605 S.W.2d 275, 277
(Tex. Crim. App. 1980).
2. Cardona, 665 S.W.2d at 493-94.
3. Ante, op. at 10-11.
4. Ante, op. at 11.
5. 411 U.S. 778 (1973).
6. 408 U.S. 471 (1972).
7. Ex parte Carmona, 185 S.W.3d 492, 495 (Tex. Crim. App. 2006) (plurality op.)
(citing Gagnon, 411 U.S. at 796)).
8. Black v. Romano, 471 U.S. 606, 614 (1985); Euler v. State, 218 S.W.3d 88, 91
(Tex. Crim. App. 2007).
9. See Naquin v. State, 607 S.W.2d 583, 586 (Tex. Crim. App. 1980).
10. Tex. Code Crim. Pro. art. 42.12, §§ 22, 23(a).
11. Id. § 11(a).
12. See, e.g., United States v. Montgomery, 635 F.3d 1074, 1094 (8th Cir. 2011); 
Nawrocki v. Twp. of Coolbaugh, 34 F.App'x 832, 838 (3rd Cir. 2002); United States v.
Lea, 249 F.3d 632, 638-41 (7th Cir. 2001); United States v. Cordoba, 104 F.3d 225, 228
(9th Cir.1997); United States v. Posado, 57 F.3d 428, 434 (5th Cir.1995); United States v.
Odom, 13 F.3d 949, 957 (6th Cir. 1994); United States v. Piccinonna, 885 F.2d 1529,
1531-37 (11th Cir.1989).
13. 
[13] Tennard v. State, 802 S.W.2d 678, 683 (Tex. Crim. App. 1990); Nethery v.
State, 692 S.W2d 696, 700 (Tex. Crim. App. 1985).
14. 
 [14] Nesbit v. State, 227 S.W.3d 64, 66 n.4 (Tex. Crim. App. 2007) (claiming in
dicta, "Neither the results of a polygraph test nor the fact of failing a polygraph test are
admissible in a Texas criminal proceeding.").
15. 
 15 See Cobb v. State, 851 S.W.2d 871, 873 (Tex. Crim. App. 1993).
16. 
 [16] See, e.g., Romero v. State, 493 S.W.2d 206, 211 (Tex. Crim. App. 1973) (citing,
in addition to other concerns, "the supposed tendency of the trier of the facts to treat
polygraph evidence as conclusive on the issue of the guilt of the accused, the lack of
standardization of test procedures, and the difficulty for jury evaluation of examiners'
opinions."); Nichols v. State, 378 S.W.2d 335, 337-38 (Tex. Crim. App. 1964) ("The
jurors, being lay persons, no doubt felt that the evidence of a lie detector test would reveal
the truth . . . .").
17. See Nawrocki, 34 F.App'x at 838 (holding the District Court did not abuse its
discretion in admitting polygraph evidence because it was not being admitted for its truth,
but rather to prove probable cause); United States v. Miller, 874 F.2d 1255, 1261 (9th Cir.
1989) (stating "that polygraph evidence might be admissible if it is introduced for a
limited purpose that is unrelated to the substantive correctness of the results of the
polygraph examination.").
18. 
 18 Tex. R. Evid. 703.
19. [19] Tex. Occ. Code § 110.151.
20. 
 [20] See 22 Tex. Admin. Code § 810.64(d)(18) (2012) ("Sexual history polygraphs
shall include all aspects of a client's sexual behaviors and a victim's list that occurred
prior to the offense of conviction."); Id. § 810.64(d)(17) ("Licensees should refer the
client for a polygraph exam as soon as possible if the client is suspected of engaging in
suppression behaviors on the PPG [penile plethysmograph]."); id. § 810.65(g) ("The
licensed sex offender treatment provider is primarily responsible for preparing the
juvenile for any polygraph."); id. § 810.68(3) ("Treatment shall address the sequence of
behaviors, emotions, and cognitions which are identifiable and which precede deviant
sexual behavior in a predictable manner. Autobiographies, sexual history polygraphs,
offense reports, interviews and cognitive-behavioral chains shall be used to identify
antecedents to offending."); id. § 810.2(31) ("[']Successful Completion of Sex Offender
Specific Treatment[']--May include . . . no deception indicated on exit polygraphs, the
indication of a non-deceptive examination result on the sex history polygraph . . . .").
21. Davis v. State, 308 S.W.2d 880, 883 (Tex. Crim. App. 1958); accord Gomez v.
Atkins, 296 F.3d 253, 264 n.8 (4th Cir. 2002) ("While polygraphs are generally not
admissible at trial, such tests are a well-recognized law enforcement technique, and a
reasonable officer might take their results into account in assessing probable cause.").
22. Ex parte Renfro, 999 S.W.2d 557, 561 (Tex. App.--Houston [14th Dist.] 1999,
pet. ref'd) (citing 3A Wigmore on Evidence § 999, at 946 (Chadbourn Rev. 1970); see
People v. Miller, 208 Cal. App. 3d. 1311, 1315 (1989).
23. [23] Appellant's Br. on the Merits at 9.
24. See 22 Tex. Admin. Code § 810.68(3) ("Autobiographies, sexual history
polygraphs, offense reports, interviews and cognitive-behavioral chains shall be used to
identify antecedents to offending.").