Vacated in part, affirmed in part, and remanded by published opinion. Judge MICHAEL wrote the opinion, in which Judge GREGORY joined. Judge WILKINSON wrote a separate dissenting opinion.
OPINION
MICHAEL, Circuit Judge:
Decoma Love-Lane, an African American, sued the Winston-Salem/Forsyth County, North Carolina, Board of Education (the Board) and its superintendent, Dr. Donald Martin, in the Middle District of North Carolina, alleging that she was demoted from the position of assistant principal to teacher because she spoke out against race discrimination (her free speech claims) and because of her race (her discrimination claims). The district court granted summary judgment to the Board and Martin on all of Love-Lane’s claims, and she appeals. We conclude that Love-Lane has raised a genuine issue of material fact as to whether she was demoted in retaliation for her speech, which would be a violation of the First Amendment. We also conclude that Martin is not entitled, in his individual capacity, to qualified immunity on Love-Lane’s First Amendment claim, and we therefore vacate the grant of summary judgment to Martin individually on that claim. We affirm the grant of summary judgment (1) to the Board, and to Martin in his official capacity, on Love-Lane’s First Amendment claim, (2) to both defendants on her federal race discrimination claims, and (3) *769 to both defendants on her free speech and race discrimination claims asserted under the North Carolina Constitution.
I.
Love-Lane is employed by the Winston-Salem/Forsyth County Board of Education. She worked for the Board as a high school teacher from 1974 until 1988, and from 1988 until 1998 she was an assistant principal at four middle and elementary schools. In her first three jobs as assistant principal, which spanned seven years (1988-95), Love-Lane consistently received evaluations of excellent or superi- or in almost all aspects of her performance; she was told that her strongest skills were in the areas of communication and problem solving. J.A. 2000. Each of the principals for whom she worked in these years recommended her for promotion. J.A. 1199-2000.
During the summer of 1995, Superintendent Martin notified Love-Lane that she would be assigned the job of assistant principal at Lewisville Elementary School, where Martin said “an African-American presence” was needed. J.A. 1444. Love-Lane expressed concern to Martin about the assignment because she had heard that Lewisville’s principal, Brenda Blanchfield, who is white, had difficulty in dealing with African American assistants. Love-Lane also understood that there were racial tensions at Lewisville because Blanchfield had been ineffective or insensitive in addressing the problems and concerns of African American teachers, students, and parents. J.A. 362, 366-67, 594, 1164, 1201, 1215. Love-Lane’s understanding was accurate. According to one African American teacher, “serious racial tension” developed between the school administration and staff at Lewisville after Blanchfield “took over as principal.” J.A. 362. For instance, on one occasion the Lewisville faculty was discussing time options for a satellite PTA meeting in East Winston, a predominantly African American community served by the school. When a late afternoon meeting was proposed, several teachers pointed out that working parents would not be able to attend. Blanchfield responded that “it did not matter what time the meeting was held since nobody in East Winston works anyway.” J.A. 1165, 363. After certain teachers objected to this comment, Blanch-field apologized. Id. On another occasion, Blanchfield allegedly used the term “CP time, or colored people’s time.” J.A. 1402. Martin acknowledged that “there were some problematic situations [at Lewisville] in terms of racial perceptions,” J.A. 76, and that “minority parents perceive Lewis-ville and Brenda Blanchfield negatively,” J.A. 77. Daisy Chambers, an assistant superintendent who knew both Blanchfield and Love-Lane, recommended that Love-Lane not be assigned to Lewisville. Because Blanchfield and Love-Lane had different approaches to administration, Chambers believed that they would have difficulty “working] together as a team.” J.A. 607. Despite the concerns expressed by Chambers and Love-Lane, Martin held to his decision, and Love-Lane was transferred to Lewisville. Love-Lane accepted the new assignment, telling Martin that she would do her best to work with Blanchfield. Love-Lane, however, asked Martin to “monitor the situation,” and he promised that he would. J.A. 1201.
Love-Lane started her job as assistant principal at Lewisville Elementary School in November 1995. The school is located in the suburbs and to . a large extent serves middle to upper class white children from the surrounding area. However, a number of African American children from poor or working class families in East Winston are bused to Lewisville. During Love-Lane’s three years at the school, about sixty-five *770 percent of the students were white and about thirty-five percent were African American. Love-Lane describes the Lew-isville staff as “overwhelmingly white.” Out of a staff of approximately 100, the number of African American teachers ranged from two to six during Love-Lane’s time at the school. J.A. 1201.
Soon after Love-Lane began working at Lewisville, she discovered disciplinary practices at the school that placed many African American students at a disadvantage. Her main concern was the “time-out room,” where teachers could send students who were misbehaving. Love-Lane had several objections to the time-out room. First, a disproportionate number of African American students, particularly African American boys, were sent to the timeout room. Some teachers called on white girls to escort African American boys to the room, a practice that was no doubt humiliating to the boys. J.A. 1207. Second, the time-out room served to relieve individual teachers of responsibility for handling discipline problems in the classroom. A student could be referred to the room for any infraction without the knowledge or approval of the principal or assistant principal. In other words, there were no safeguards to prevent a teacher from making excessive use of the time-out room. Love-Lane noticed that students were often sent to the room “for the most minor of infractions.” J.A. 1205. At times there were so many children crowded into the room that there was “standing room only.” J.A. 1220. Third, the students who were sent to the time-out room were not given adequate instruction. The staff person who ran the time-out room was not a certified teacher, and she had no training in how to deal with problem students. The problem of inadequate instruction was magnified because “many of the same students [were] referred to the time-out room repeatedly, for long periods of time by many of the same teachers.” J.A. 1207. According to Love-Lane, the time-out room “denied quality instruction to many of the children who needed it most — the African-American children who were being bused from East Winston.” J.A. 1207. Love-Lane was especially concerned about fifth grade students because several of their teachers were strong advocates of the time-out room and used it continually. J.A. 1204, 1405. Some fifth graders were sent routinely to the time-out room at 8:45 a.m., just as classes began for the day. J.A. 1220. Love-Lane feared that the room was used, especially by some fifth grade teachers, simply to “warehouse” African American boys. J.A. 1203, 1204-07, 1212-14.
Love-Lane’s assessment that the timeout room was being used in a racially discriminatory way is indicative of larger concerns that she and others had about race relations at Lewisville. Love-Lane observed that disciplinary measures in the classrooms “seemed directed toward the black students for the most part,” both in terms of frequency and severity of punishment. J.A. 1214. Another Lewisville staff member recounted how one teacher “would have black males sit at desks facing the corner of [the] room with their faces to the wall.” J.A. 1227. What Love-Lane saw as discriminatory discipline extended beyond the classroom. Once, Love-Lane saw a teaching assistant “with her foot in a little black boy’s back as he lay on the hall floor crying.” J.A. 1207. On another occasion, Love-Lane had a substantial disagreement with several fifth grade teachers who were excluding a number of African American and poorer white students from the class trip to Washington, D.C., and Williamsburg, Virginia. There were no established criteria for excluding a student, and the teachers were using minor infractions to justify ex- *771 elusion. Love-Lane brought the problem to the attention of Blanchfield, who refused to intervene. As a result, “approximately full classes of students were left at the school, most of whom were African-American and poor students.” J.A. 1214.
Love-Lane also believed that a number of staff members at Lewisville were insensitive to African American culture. J.A. 1202. One day, for example, an African American girl went home in tears after her fifth-grade teacher barred her from class “because, in [the teacher’s] terms, the student’s ‘jelly curl or what ya’ll call it, stinks.’ ” J.A. 1213. See also J.A. 1226. The director of the Board’s African-American Infusion Project observed that many teachers at Lewisville were not receptive to diversity training workshops, and the director was especially “concerned that Mrs. Blanchfield did not seem to address the problem of the teachers’ insensitivity or lack of interest” in this area. J.A. 360. Parents of African American children expressed similar concerns about “the racial problems at Lewisville,” J.A. 389, and about “teachers who seemed to have no awareness or sensitivity to racial issues.” J.A. 393.
Despite her concerns about the time-out room and other disciplinary practices that appeared to be discriminatory, Love-Lane “was careful not to make any quick judgments” during her first year at Lewisville (1995-96). J.A. 1203. Instead of “question[ing] how things were done,” she concentrated on “getting acquainted with the staff, teachers and students,” J.A. 1203, and in trying to establish good relationships with her colleagues, J.A. 127. By the end of her first year, she felt accepted by her Lewisville colleagues, and she received a superior evaluation from Blanch-field, the principal.
As her second year (1996-97) at Lewis-ville got under way, Love-Lane felt that she had to discuss with Blanchfield her concerns about the discriminatory disciplinary practices at Lewisville. Love-Lane understood her professional charge from Martin to be “raising the awareness or consciousness of [Lewisville] teachers” about minority issues, and she understood that she and Blanchfield were to work together on this goal. J.A. 127. But every time that Love-Lane tried to discuss her concerns about disciplinary practices, including use of the time-out room, with Blanchfield, she was either rebuffed or ignored. J.A. 1206, 1208. After Blanch-field refused to address the subject of discriminatory discipline, Love-Lane began voicing her concerns at faculty meetings and at School Improvement Team (SIT) meetings. J.A. 363-64, 388. The SIT was an advisory group of administrators, teachers, and parents, whose goal was to “make suggestions designed to improve education at Lewisville for all students.” J.A. 387. Love-Lane and Blanch-field both attended SIT meetings. Id. One parent-member of the SIT said that in these meetings Love-Lane often raised issues about disciplinary practices that placed African American and poorer students at a disadvantage. According to this parent, “it would be evident from Ms. Blanchfield’s body language that she resented Ms. Love-Lane bringing up these issues ... [though] Ms. Love-Lane always acted respectfully toward Ms. Blanchfield.” J.A. 388. Some of the teachers, especially from the fifth grade, also resented the fact that Love-Lane was raising questions about disciplinary practices at Lewisville. J.A. 364, 415. After Love-Lane spoke out at one faculty meeting, a few teachers told Blanchfield - that they were offended by Love-Lane’s disrespectful tone and by her characterization of the teachers’ use of the time-out room as “unprofessional.” J.A. 955. Love-Lane denies -that she was disrespectful, and a number of teachers and *772 parents who heard Love-Lane talk about the disciplinary practices described her tone and manner as professional and respectful. J.A. 354, 387-88, 394. Nevertheless, as one teacher’s assistant put it, “[i]t was common knowledge throughout the school that some of the fifth grade teachers had banded together against Ms. Love-Lane.” J.A. 398.
During her second year at Lewisville, Love-Lane also expressed her concerns about race discrimination in discipline directly to Superintendent Martin. J.A. 1208, 1210-11. She told him that “African-American parents were not happy with how their children were being treated at Lewisville.” J.A. 1407. According to Love-Lane, “Martin indicated little concern for the racial issues I was raising; he seemed more concerned that I not make waves — that I avoid any actions which might cause conflict.” J.A. 1210. Martin said that he discounted Love-Lane’s concerns that minority children at Lewisville were being “denied equal access to education” because he did not agree with her assessment of the situation. J.A. 1365.
At the end of Love-Lane’s second year at Lewisville, she received her annual evaluation from Blanchfield. Although she received excellent ratings on most of her work, she received for the first time lower ratings on her communication skills. Blanchfield told Love-Lane that 85 percent of the teachers found her intimidating and that they objected to her direct style of communication. J.A. 1210. Blanchfield refused, however, to provide Love-Lane with any details about these complaints. Id. Blanchfield did tell Love-Lane that she had concerns about Love-Lane’s inability to accept feedback and her “blatant actions of disrespect toward” Blanchfield. J.A. 868-69. Blanchfield recommended that Love-Lane receive only a two-year contract as an assistant principal. J.A. 869. (Administrators were given contracts of up to four years.) Blanchfield informed Love-Lane that she had “many strengths which if coupled with improvements in working relationships and respect for those [Love-Lane is] assigned to work with would make [her] very effective and efficient in a leadership role.” Id. Blanch-field then advised Martin that she no longer wanted to work with Love-Lane. Love-Lane, for her part, requested a transfer. J.A. 969, 1211. At the end of this second year Love-Lane again confronted Martin about “the treatment of African-American children [at Lewisville], particularly with reference to the time-out room.” J.A. 1211. According to Love-Lane, “Martin listened but made no commitment to take any action.” Id. Love-Lane received no response to her transfer request. Id.
On June 11, 1997, as her second year at Lewisville was ending, Love-Lane was involved in an altercation with a teacher. Each woman alleged that the other called her names and used profanity. Blanch-field issued a letter of reprimand to both women, prompting Love-Lane to file a grievance. J.A. 1069. Love-Lane filed her employee grievance form on August 15, 1997, claiming that she was being discriminated against because of her race. J.A. 1017. She alleged that the letter of reprimand was based on Blanchfield’s biased investigation. Id. Love-Lane’s grievance prompted Superintendent Martin to assign a paralegal in his office to conduct an investigation into the altercation. J.A. 1029. The investigator reviewed the materials that had been compiled by Blanch-field in her investigation of the altercation, and he interviewed witnesses identified by both Blanchfield and Love-Lane. The investigator concluded that both Love-Lane and the teacher had used profanity and that Blanchfield’s reprimands were justified. J.A. 1029-31. Martin received a *773 written and oral report from the investigator in early September 1997. Id. Based on the report, Martin sent Love-Lane a letter on September 28, 1997, warning her that “[a]nother such outburst” would result in a recommendation for her dismissal. J.A. 975. Martin did not personally investigate Love-Lane’s discrimination claim because, according to him, “race had nothing to do with [the problems between Love-Lane and Blanchfield]. It was clearly personality conflict. Race had nothing to do with it.” J.A. 1401.
In October 1997, at the beginning of Love-Lane’s third year at Lewisville, Martin met with her and Blanchfield. In a letter that Martin handed to both women, he strongly encouraged them to work together in a spirit of cooperation; otherwise, he said, changes would have to be made at Lewisville. J.A. 969. Martin made several points in his letter. He noted that “neither [Blanchfield nor Love-Lane] has much respect or trust in the other” and that he had never “experienced a conflict between two school administrators as acrimonious and divisive.” J.A. 976. Martin said, however, that “there is no ... basis to believe that the conflict between these two administrators is based upon the race of the individuals.” J.A. 978. Martin did believe that the bad working relationship between the two women “adversely affected the effectiveness of the administration of the school,” J.A. 977, but he was careful to note that the welfare and safety of the students were not at risk, J.A. 978. Martin’s letter had specific warnings for Love-Lane. She was told that if she disagreed with any of Blanchfield’s policies, she should state her disagreements to Blanchfield in private, not in public to the faculty, students, or parents. J.A. 979. Finally, Love-Lane was warned that she would have no future as a school administrator unless she was “able and willing to respect the authority of the principal and to rebuild that degree of trust that is necessary for her to function effectively as a school administrator.” J.A. 980. Love-Lane responded to Martin’s letter by telling him once again that “it was the students [she] was concerned about,” especially the African American students who “were being treated improperly in the time-out room and otherwise.” J.A. 1212. Martin, who admits that Love-Lane raised these concerns a number of times between the spring and fall of 1997, J.A. 968, 1306, told Love-Lane that it was not her “job to worry about the children ... but that it was [her] job to please [her] principal,” J.A. 1212. Martin ignored Love-Lane’s expressions of concern about the discriminatory disciplinary practices and told her point blank that he did not want to “hear from [her] or Lewisville that year.” Id. See also J.A. 1306.
Notwithstanding Martin’s warnings, Love-Lane continued to voice her concerns about race discrimination at Lewis-ville during her third year (1997-98) there. As a result, her relationship with Blanch-field deteriorated even further. In January 1998 the fifth grade teachers complained about Love-Lane to Blanchfield and requested that another administrator be assigned to the fifth grade team for the rest of the year. J.A. 959-61. Specifically, the teachers told Blanchfield that they were having difficulty in communicating with Love-Lane and that she was not treating them as professionals. Id. In the spring of 1998 the fifth grade teachers again complained, this time to Martin, about their difficulties in working with Love-Lane. J.A. 1155-56. According to Martin, these teachers regarded Love-Lane as overbearing, intimidating, and un-supportive of their disciplinary practices. J.A. 1328, 1372. On May 7, 1998, Blanch-field completed a draft evaluation of Love-Lane’s performance for her third year at *774 Lewisville. Blanchfield rated Love-Lane “below standard” and “unsatisfactory” in three areas that related primarily to communication skills and efforts. Love-Lane received ratings of “at standard” or above in eight of eleven evaluation categories, including two ratings of “well above standard.” J.A. 292-96. Martin and Amanda Bell (an assistant superintendent) reviewed the evaluation before it was given to Love-Lane. J.A. 290. On May 11, 1998, Blanchfield sent Love-Lane a memo, with copies to Martin and Bell, stating that she (Blanchfield) considered Love-Lane’s “continued vocal opposition to our implementation of the Time-Out Room as blatant disrespect for me.” J.A. 1268. On June 2 Martin sent Love-Lane a memo informing her that she would “be assigned to a different school, working in a nonadministrative position for the 1998-99 school year.” J.A. 481. Love-Lane was ultimately assigned to teach high school classes at North Forsyth High School. J.A. 1216. Love-Lane’s pay level was maintained until the end of her administrative contract. Martin’s memo informed Love-Lane of Blanchfield’s claim “that [Love-Lane] put forth minimal efforts to carry out the role, responsibilities, and functions of an assistant principal,” which resulted in her lower evaluation for the 1997-98 school year. J.A. 481. Martin claimed that Love-Lane had failed to respond positively to his October 1997 recommendations and that she lacked the “ability or desire to rebuild respect and trust” with Blanchfield and other staff members at Lewisville. Id. Martin concluded that Love-Lane’s “unwillingness to reestablish working relationships with the principal and staff’ had convinced him that Love-Lane did “not have a future as an administrator” in the school system. Id. Martin says that he “was not aware of, and did not consider” that Love-Lane “had engaged in any First Amendment activities.” J.A. 973. Blanchfield, too, was transferred out of Lewisville and was placed at the school system’s central office for the 1998-99 year. J.A. 290.
Love-Lane filed a grievance with the Board challenging Martin’s decision to reassign her. A panel of three Board members held a hearing in Love-Lane’s case on August 4, 1998, and the following two issues were considered:
1. Whether or not the recommendation of the Superintendent [Martin] to nonrenew the two-year administrative contract of Ms. Decoma Love-Lane is arbitrary, capricious, or for personal or political reasons.
2. Whether or not the Superintendent [Martin] has the authority to assign Ms. Love-Lane to a teaching position for the remaining year of her administrator’s contract.
J.A. 991. The three-member Board panel received documents from both sides, including a “grievance book” that Love-Lane had compiled. J.A. 273, 304. The panel also heard statements from Love-Lane’s lawyers, Love-Lane, Martin, and Blanchfield. Id. The minutes of the hearing reflect that one of Love-Lane’s lawyers argued to the panel that “the disagreements evidenced in the record between Ms. Blanchfield and Ms. Decoma Love-Lane were personal in nature and, therefore, the Board should not uphold” Martin’s decision. J.A. 992. Love-Lane told the panel that “her career was being sabotaged by Ms. Blanchfield” and that Blanchfield’s recommendations regarding Love-Lane’s future were “personal in nature.” J.A. 993. Love-Lane denied that her performance had been unsatisfactory or below standard. Id. Martin said that the reasons stated in his June 2, 1998, memo to Love-Lane justified his decision to remove her from the assistant principal’s job at Lewisville and reassign her to *775 a teaching position. The Board panel voted 2-1 to uphold Martin’s reassignment decision. The one member who dissented did so because it appeared that “Dr. Martin had already made up his mind about what he wanted to happen.” J.A. 264. This member “became concerned because [she] didn’t feel that [Martin] had given Ms. Love-Lane a fair shake.” Id. Because the panel’s decision was not unanimous, Love-Lane was able to appeal the issue to the full Board, which upheld the decision after reviewing the record before the panel and hearing argument from the lawyers for both sides. J.A. 273-74, 314-15. Love-Lane continues to work in her high school teaching position, but she claims to have lost any opportunity to pursue her preferred career path in school administration. J.A. 1216.
On August 28, 1998, Love-Lane filed a charge of race discrimination and retaliation against the Board and Martin with the Equal Employment Opportunity Commission (EEOC). She received a right to sue letter from the EEOC on June 30, 1999. On August 26, 1999, Love-Lane filed a complaint in federal court against the Board and Martin, alleging race discrimination, retaliation, and the denial of her rights to free speech and due process of law in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the North Carolina Constitution. After extensive discovery the defendants filed a motion for summary judgment, which the district court granted. The district court concluded that Love-Lane could not establish a violation of her rights to free speech and due process of law and that she failed to make out a prima facie case of race discrimination. J.A. 644-84. Love-Lane appeals the judgment, but she does not pursue the due process claim.
II.
Love-Lane contends that the district court erred in granting summary judgment to the Board and Martin on her free speech and race discrimination claims. We review the summary judgment decision de novo. Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002). Summary judgment is appropriate only when “there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c). In reviewing the summary judgment, we view the facts in the light most favorable to Love-Lane, the nonmoving party, drawing all justifiable inferences in her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The dissent does the opposite: it ignores the best of Love-Lane’s evidence and states the facts in the light most favorable to the Board and Martin. This mistaken approach, of course, allows the dissent to say that this case involves nothing more than a superintendent’s “decision to separate ... two administrators embroiled in a personality conflict.” Post at 790. This case involves much more than a personality conflict when the facts are viewed, as they must be, in Love-Lane’s favor: it involves a superintendent who demoted an assistant principal because she spoke out against race discrimination in discipline at a public school.
III.
A.
We turn first to the district court’s rejection of Love-Lane’s claim, asserted under 42 U.S.C. § 1983, that the Board and Martin violated her right to free speech guaranteed by the First Amendment to the Constitution of the *776 United States. The government may not retaliate against a public employee who exercises her First Amendment right to speak out on a matter of public concern. See Pickering v. Bd. of Educ., 391 U.S. 563, 573, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). This means, for example, that “[a] state may not dismiss 'a public school teacher because of the teacher’s exercise of speech protected by the First Amendment.” Stroman v. Colleton County Sch. Dist., 981 F.2d 152, 155-56 (4th Cir.1992). The First Amendment does not protect all speech by public employees. “Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest” fall outside the First Amendment because they are not matters of public concern. Id. at 156. Even speech on a matter of public concern does not automatically qualify for First Amendment protection: the speaker’s interest in free expression is “tempered by the government’s interest in governmental effectiveness, efficiency, order, and the avoidance of disruption.” McVey v. Stacy, 157 F.3d 271, 277 (4th Cir.1998).
Retaliatory employment action violates a public employee’s right to free speech under the following conditions. First, the speech must relate to a matter of public concern. Id. Second, the “employee’s interest in First Amendment expression must outweigh the employer’s interest in efficient operation of the workplace.” Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 352 (4th Cir.2000) (internal quotation marks omitted) (citing Pickering, 391 U.S. at 568, 88 S.Ct. 1731). (This part of the inquiry is known as the Pickering balancing test.) Third, there must be a causal relationship between the protected speech and the retaliatory employment action; specifically, “the protected speech [must be] a ‘substantial factor’ in the decision to take the allegedly retaliatory action.” Id. (internal quotation marks ■ and citation omitted). The first two elements involve questions of law. The third element, causation, can be decided on “summary judgment only in those instances when there are no causal facts in dispute.” Id.
1.
The first question is whether Love-Lane’s speech was about a matter of public concern. “Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community.” Urofsky v. Gilmore, 216 F.3d 401, 406-07 (4th Cir.2000). The Supreme Court has made it clear that statements about a “[s]chool [district’s allegedly racially discriminatory policies involve[] a matter of public concern.” Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citing Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)). We, too, have repeatedly recognized that a public employee’s speech about racially discriminatory practices, particularly in public schools, involves a matter of public concern. See Seemuller v. Fairfax County Sch. Bd., 878 F.2d 1578, 1582 (4th Cir. 1989); Arvinger v. Mayor & City Council of Baltimore, 862 F.2d 75, 78 (4th Cir. 1988); cf. Piver v. Pender County Bd. of Educ., 835 F.2d 1076, 1079 (4th Cir.1987); English v. Powell, 592 F.2d 727, 732 n. 5 (4th Cir.1979). In analyzing whether speech involves a matter of public concern, we consider “the content, form, and context of [the] given statements], as revealed by the whole record.” Connick, 461 U.S. at 147-48, 103 S.Ct. 1684. In this case, content and context are key. The content or subject matter of Love-Lane’s speech dealt with disciplinary practices at Lewisville that discriminated against African American children. According to Love-Lane, African American children *777 were disciplined more severely than other students. For example, they were sent more often to the time-out room, where they received no meaningful instruction. This speech did not relate to a private issue between Love-Lane and her employer. Rather, the summary judgment record demonstrates that it dealt with an issue of major concern to many in the Lewisville school community, including teachers, parents, and students.
The context of Love-Lane’s speech is also important. Race discrimination in discipline was a topic Love-Lane spoke up about at SIT meetings, at Lewisville faculty meetings, and at private meetings with Blanchfield or Martin. The meetings of the SIT (the advisory group of teachers, administrators, and parents) often focused on how to improve the education of Lewis-ville’s “at-risk kids,” many of whom were African American. J.A. 387-88. Thus, at SIT meetings when Love-Lane talked about race discrimination in discipline, she was raising exactly the sort of issue that was meant to be discussed at such meetings — meetings that were attended by parent representatives from the community. Cf. Fiver, 835 F.2d at 1081 (noting that the public importance of a teacher’s speech on the subject of a principal’s tenure was demonstrated when “part of the speech took place at a public meeting called for the very purpose of soliciting opinions” on the tenure question). The fact that Love-Lane at times voiced her complaints about discriminatory discipline in faculty meetings and in private meetings with Blanch-field or Martin does not forestall a conclusion that her speech involved a matter of public concern. In the end, Love-Lane’s “right to protest racial discrimination — a matter inherently of public concern — is not forfeited [because she sometimes chose] a private forum.” Connick, 461 U.S. at 148 n. 8, 103 S.Ct. 1684 (emphasis added). See also Cromer v. Brown, 88 F.3d 1315, 1326 (4th Cir.1996). In sum, the content and context of Love-Lane’s speech establish that she was speaking about a matter of public concern.
The dissent claims that “Love-Lane’s speech on ... discriminatory practices was but a small part of her tenure at Lewis-ville.” Post at 795. It thus suggests that Love-Lane did not speak out often enough about discriminatory discipline to qualify as a citizen speaking on a matter of public concern. See post at 794. This simply ignores Love-Lane’s evidence in the summary judgment record. Time and again, that evidence shows, Love-Lane voiced her opposition to the time-out room and other disciplinary practices that discriminated against African American students. J.A. 385, 387-88, 415, 1168. She pointed out that African American students were disciplined in ways that often excluded them from regular class participation and from participation in activities such as class trips. J.A. 1203-07. Love-Lane has proffered evidence that she was persistent in speaking up about these problems, particularly the time-out room, in discussions with Blanchfield and Superintendent Martin and in meetings of the faculty and the SIT. One parent-member of the SIT summed up the focus and persistence of Love-Lane’s speech in this way:
Ms. Love-Lane informed us [in the SIT meetings] that there was an overwhelming number of African-American students that were in the time-out room, that were sent to the office, and that were suspended. Ms. Love-Lane attempted to address the reasons for this situation time and again. Ms. Love-Lane spoke out about the fact that some of the teachers were arbitrary in their discipline, and did not know how to control African-American children. She expressed concerns about some teachers’ lack of understanding of cultural differ- *478 enees. She wanted us to try to work towards resolving the problem.
J.A. 394 (emphasis added). The record, when read in the light most favorable to Love-Lane, leaves no doubt that she spoke out regularly about discriminatory discipline, a matter of public concern.
2.
Next, we consider whether Love-Lane’s free speech interest out-weighs the interest of the Board and the Superintendent in the efficient operation of the school system. See Pickering, 391 U.S. at 568, 88 S.Ct. 1731. The interest of the community is also weighed in this evaluation. Cromer, 88 F.3d at 1326. The government employer must make a stronger showing of the potential for inefficiency or disruption when the employee’s speech involves a “more substantial ]” matter of public concern. Connick, 461 U.S. at 152, 103 S.Ct. 1684. See also Hall v. Marion Sch. Disk No. 2, 31 F.3d 183, 195 (4th Cir.1994) (“When an employee’s speech substantially involves matters of public concern ... the state must make a stronger showing of disruption in order to prevail.”). An assistant principal’s detailed claim of race discrimination against African American students in a public school involves a serious and substantial issue of public concern. The summary judgment record demonstrates that this issue was of special importance to parents of African American children at Lewisville and to many in the larger community. J.A. 75-76, 387-88.
Because of the especially strong interest of the speaker (Love-Lane) and the community in the subject of Love-Lane’s speech, the Board and Martin bear a heavier burden in attempting to show that their efficiency concerns outweigh Love-Lane’s free speech interests. Factors that we take into account in balancing these interests include whether the employee’s speech (1) impairs the ability of supervisors to mete out discipline, (2) impairs harmony among co-workers, (3) damages close working relationships, (4) impedes the performance of the public employee’s duties, (5) interferes with the operation of the agency, (6) conflicts with the responsibilities of the employee within the agency, and (7) is communicated to the public or to co-workers in private. McVey, 157 F.3d at 278 (citing Rankin v. McPherson, 483 U.S. 378, 388-91, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). In this case the Board and Martin argue that Love-Lane’s speech adversely affected school administration and resulted in poor working relationships between Love-Lane and other teachers and between Love-Lane and Blanchfield.
In considering the employer’s efficiency concerns, we take into account the disruptions or inefficiencies caused by the content of the speech for which First Amendment protection is sought. Givhan, 439 U.S. at 415 n. 4, 99 S.Ct. 693. Of course, the speech “will not be considered in a vacuum; the manner, time, and place of the employee’s expression are relevant, as is the context in which the dispute arose.” Rankin, 483 U.S. at 388, 107 S.Ct. 2891. The defendants’ proffered evidence reveals that certain teachers (mostly from the fifth grade) and administrators regarded Love-Lane as abrasive and confrontational. J.A. 1002-03, 1155-56, 1210. A few fifth-grade teachers complained on one occasion that Love-Lane called their use of the time-out room “unprofessional.” And Blanchfield said that she took Love-Lane’s vocal opposition to the time-out room as a sign of “blatant disrespect.” It appears that the teachers and administrators who took offense at Love-Lane’s manner or tone also took offense at the content of her speech opposing race discrimination in discipline. (The dissent contends that this last statement “finds no support in the record,” post at 794, but it does. For *779 example, one fifth-grade teacher who opposed the time-out room “heard [other fifth-grade] teachers on more than one occasion express resentment toward Ms. Love-Lane for questioning discipline practices” such as their use of the time-out room. J.A. at 364.)
For her part, Love-Lane states that she voiced her concerns about race discrimination in a sincere and respectful way. J.A. 1203-04. Love-Lane’s own statements must be credited for purposes of summary judgment, and contrary to what the dissent suggests, see post at 795, her position has much support in the record. A number of Love-Lane’s fellow staff members at Lewisville, as well as parent-members of the SIT, confirm that her speech and manner were professional and reassuring, not disruptive or disrespectful. See, e.g., J.A. 354 (assistant principal stating that Love-Lane performed her duties “in a professional manner.”); J.A. 384 (teacher stating that Love-Lane was “warm, passionate and professional” and that “[e]hildren, parents and teachers felt comfortable talking with [her].”); J.A. 1166 (teacher stating that Love-Lane was “articulate, genuine, caring, and accessible” in her role as assistant principal); J.A. 414 (teacher stating that Love-Lane “was pleasant to work with and I respected her.”); J.A. 397 (teacher’s assistant stating that Love-Lane was “an excellent assistant principal” who “had the children’s well-being at heart.”); J.A. 349 (parent-member of the SIT stating that “Love-Lane was always respectful and professional” in voicing her objections to the time-out room and other disciplinary practices that worked against African-American students). Superintendent Martin himself acknowledged that the “welfare of the students” was not “at risk as a result of any action or in action [sic] by” Love-Lane. J.A. 978. We have thus analyzed the effects of both the content and manner of Love-Lane’s speech, and we have done it in a way that is well within the parameters of the cases cited by the dissent. See e.g., Leary v. Daes-chner, 228 F.3d 729, 738 (6th Cir.2000) (concluding that even though plaintiff-teachers’ speech criticizing their school’s handling of student discipline “was often conducted in a disrespectful manner,” the speech was “of sufficient public importance to outweigh the [school board’s] interest in limiting that speech.”).
In sum, the evidence, especially when viewed in Love-Lane’s favor, shows that her speech did not affect the ability of administrators and teachers at Lewisville to deliver their educational services; nor did her speech diminish the quality of education being provided. But even if Love-Lane’s speech — exposing and opposing race discrimination — caused some disharmony at the Lewisville school, we must remember that her speech dealt with a substantial issue of public concern that was of special interest to the larger Lewis-ville community. In all events, the interests of Love-Lane and the community in her speech are sufficiently substantial to outweigh the efficiency concerns expressed by the defendants.
3.
Last, we consider whether Love-Lane’s protected speech was a substantial factor in the decision to transfer her from the administrative position of assistant principal to a high school teaching position. If the causal facts about the reassignment are in dispute, summary judgment is not appropriate. Goldstein, 218 F.3d at 352. We note parenthetically that Love-Lane’s transfer or reassignment, which was a demotion in duties and responsibilities, qualifies as an adverse employment action for purposes of her free speech claim. See *780 DiMeglio v. Haines, 45 F.3d 790, 806-07 (4th Cir.1995) (citing Rutan v. Republican Party of Ill, 497 U.S. 62, 75-76, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)); Piver, 835 F.2d at 1078 (assuming that teacher’s reassignment to a school located forty miles away would constitute retaliatory action).
Love-Lane must proffer facts to demonstrate that her protected speech was a substantial factor in the decision to remove her from the job of assistant principal at Lewisville and reassign her to a teaching-position. On this point we review the record to determine whether a reasonable jury could conclude that Love-Lane’s reassignment was “substantially motivated by [her] protected speech; if a reasonable jury could reach this conclusion, then we must remand the case for trial.” Gold-stein, 218 F.3d at 357. The defendants offer several grounds, all allegedly independent of the protected speech, to support their decision to reassign Love-Lane to a teaching position. Specifically, they contend that Lové-Lane (1) displayed an unwillingness “to accept constructive criticism” from her supervisors, (2) “refused- to acknowledge any responsibility or need to develop better communication skills or better working relationships,” (3) “put forth [only] minimal efforts to carry out the role, responsibilities, and functions of an assistant principal,” and (4) demonstrated an inability or lack of desire “to rebuild respect and trust [which] adversely affected the administration of staff and Lewisville School.” J.A. 481. The Board and Superintendent Martin claim that none of Love-Lane’s evidence shows that her protected speech was a factor in their respective decisions. Martin claims specifically that he did not consider Love-Lane’s protected speech at all when he made the decision to reassign her to a teaching position. The defendants (and the dissent), however, ignore much of Love-Lane’s side of the summary judgment record. Our review of the record reveals that Love-Lane has proffered sufficient circumstantial evidence to establish that her protected speech (her vocal opposition to the discriminatory discipline practices at Lewisville) was a substantial factor in the decision to demote her to a teacher’s position. Cf. Peters v. Jenney, 327 F.3d 307, 323 (4th Cir.2003) (vacating grant of summary judgment to defendant where the plaintiff presented limited, but sufficient, evidence of a causal connection between her speech and the nonrenewal of her contract); Pike v. Osborne, 301 F.3d 182, 185 (4th Cir.2002) (concluding that the plaintiffs evidence of the causal connection between speech and retaliation was sufficient even though it was “thin and circumstantial”). We will recount this evidence.
First, as Love-Lane’s speech became increasingly more critical of race discrimination in discipline at Lewisville, her performance evaluations from Blanchfield, the principal, became increasingly more negative. At the end of Love-Lane’s first year as assistant principal at Lewisville, before she expressed concerns about the treatment of minority students, she received excellent evaluations from Blanch-field. At the end of Love-Lane’s second year, after she had spoken out about discrimination — first in private meetings with Blanchfield, where she was rebuffed, and later at faculty meetings and SIT meetings — Blanchfield gave her lowered evaluations. During her third year, as Love-Lane continued to raise concerns about race discrimination at Lewisville, her relationship with Blanchfield deteriorated even further. Near the end of the third year Blanchfield sent Love-Lane a memo, with a copy to Martin, saying that she (Blanchfield) considered Love-Lane’s “continued vocal opposition to our implementation of the Time-Out Room as blatant disrespect for me.” J.A. 1268. *781 Blanchfield sent this memo at about the same time that she completed her last evaluation of Love-Lane which rated her as “below standard” or “unsatisfactory” in three areas. Martin, of course, relied on Blanchfield’s evaluations in making the decision to reassign Love-Lane.
Second, Martin’s own assessment of Love-Lane grew more negative as she continued to speak out' about discrimination. Indeed, Martin attempted to discourage or suppress her speech. Love-Lane brought the race discrimination issue to Martin’s attention several times. Rather than face up to the issue, however, Martin “seemed more concerned that [Love-Lane] not make waves.” Martin actually instructed Love-Lane to “avoid any actions which might cause conflict.” J.A. 1210. Love-Lane’s job, Martin told her, was not to worry about the children but to please the principal, Blanchfield. Martin admitted that he did not conduct any investigation into Love-Lane’s allegations about racially discriminatory practices at Lewisville. J.A. 1364-65, 1413-15. And Martin further admitted that when Love-Lane continued to confront him about her concerns, he “told her that all of Lewisville’s business needs to stay out of my office.” J.A. 1306. Finally, Love-Lane told Martin that Blanchfield was giving her lower evaluations because she had spoken out on racial issues. See J.A. 661. Martin nevertheless decided that Love-Lane should be removed from her administrative position at Lewisville and transferred to a high school teaching position.
A rational jury could find from these facts that Blanchfield resented Love-Lane’s vocal opposition to race discrimination and that she punished Love-Lane for this speech by giving her lower evaluations. A jury could find that Martin, who endorsed Blanchfield’s evaluations and reassigned Love-Lane in part because of them, was aware of Love-Lane’s speech and Blanchfield’s opposition to it. A jury could find that Martin was unwilling to address Love-Lane’s concerns about race discrimination at Lewisville and that he even attempted to prevent Love-Lane from speaking out. A jury could find that Martin became increasingly aggravated as Love-Lane continued to bring up the subject of race discrimination at Lewisville. Finally, a jury could conclude that Love-Lane’s speech was a substantial factor in the decision to remove her from her job at Lewisville and demote her.
The dissent claims that Martin demoted Love-Lane because of her personality conflict with Blanchfield and her “tone and demeanor.” Post at 797. Love-Lane’s evidence does not allow this conclusion at the summary judgment stage. At the three schools where Love-Lane previously served as assistant principal, she had excellent relationships with her principals. These principals complimented her for her strong skills in communicating and consistently recommended her for promotion. J.A. 1199-2000. Superintendent Martin himself considered Love-Lane to be “an outgoing, people oriented administrator.” J.A. 966. Martin considered transferring Love-Lane to Lewisville because Blanchfield had allowed serious racial tensions to develop there. Martin knew that Blanchfield and Love-Lane had different approaches to school administration. Nevertheless, Martin sent Love-Lane to Lewisville as an antidote to the racial tensions and to serve as a role model for African American students. J.A. 966. As it turned out, Love-Lane and Blanchfield did not get along; but when the facts are viewed in Love-Lane’s favor, it becomes clear that this case cannot be brushed aside as a “simple personality dispute,” as the dissent attempts to do. See post at 791. Once Love-Lane went to Lewisville and assessed the situation, she *782 realized that discriminatory discipline was a major problem. When she began to speak out about the discrimination, she ran into trouble with Martin. She raised her concerns with him, and he told her that he did not want to hear about Lewis-ville. When Love-Lane persisted in speaking out, Martin demoted her. Love-Lane thus proffers sufficient evidence to raise a jury question about whether her speech was a substantial factor in the decision to demote her.
4.
We conclude that Love-Lane, who was protesting race discrimination in a public school, was speaking out on a matter of public concern. Love-Lane’s and the community’s interests in her speech outweigh the efficiency concerns of her employer. And, when we view the evidence in the light most favorable to Love-Lane, we conclude that there is a genuine issue of material fact as to whether Love-Lane’s speech was a substantial factor in the decision to demote her. The dissent contends that we have reached this conclusion by ignoring defense evidence and by “accord[ing] little respect to the record.” Post at 797. See also post at 790-792. We have not ignored the evidence proffered by the defense. See supra at 771-774, 778-779, 780-781. And we have respected the record because the entire record has been our guide. A review of the entire record reveals a factual dispute about the role of Love-Lane’s speech in her demotion that must be resolved by a jury. In sum, Love-Lane has at this stage established the elements of a claim that she was retaliated against for exercising her constitutional right to free speech.
B.
Because Love-Lane presents a valid claim for violation of her First Amendment right to free speech, we must decide whether the defendants, the Board and Superintendent Martin, are subject to suit under 42 U.S.C. § 1983. We consider in turn the potential liability of the Board and Martin (the latter is sued in both his official and personal capacities).
1.
To hold a municipality (a local government entity) liable for a constitutional violation under § 1988, the plaintiff must show that the execution of a policy or custom of the municipality caused the violation. Hall, 31 F.3d at 195. “[MJunicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.” Pembaur v. City of Cincinnati 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). To hold a municipality liable for a single decision (or violation), the decisionmaker must possess “final authority to establish municipal policy with respect to the action ordered.” Id. at 481, 106 S.Ct. 1292. In this case the Board exercised final review authority over Martin (through the three-person panel of the Board and then the full Board) in approving his decision to demote Love-Lane to a teaching position. Only this action by the Board, which involved the exercise of its final policymaking authority, may serve as the basis for Board liability. Id. Thus, the Board cannot be held hable for personnel decisions over which it did not retain final review authority; that is, it is not liable for decisions committed to Martin’s discretion because there is no respondeat superior liability under § 1983. See Monell v. Dep’t of Soc. Sens., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, the Board is only liable for acts that it has “officially sanctioned or ordered.” Pembaur, 475 U.S. at 480, 106 S.Ct. 1292. This means that Love-Lane must demonstrate that *783 the Board was aware of the constitutional violation and either participated in, or otherwise condoned, it. See Hall, 31 F.3d at 196. We conclude that Love-Lane has failed to demonstrate the necessary involvement on the part of the Board.
The minutes of Love-Lane’s grievance hearing reveal that Love-Lane did not argue to the Board’s three-person panel that either Blanchfield or Martin retaliated against her because she was exercising First Amendment rights. J.A. 278-79. Likewise, Love-Lane’s “grievance book,” which documented her case to the Board, did not contain anything that would have alerted the Board to her First Amendment claim. J.A. 195-96. Each member of the Board, which upheld Martin’s decision after Love-Lane appealed the decision of the three-member panel, stated that his or her decision had nothing to do with Love-Lane’s speech. Love-Lane thus offers no evidence that the Board punished her for, let alone was aware of, her opposition to race discrimination at Lewisville. In addition, the Board had before it legitimate grounds for upholding Martin’s decision. We conclude that Love-Lane has not produced sufficient evidence to hold the Board liable under § 1983 for a violation of her First Amendment rights. Cf. Curtis v. Okla. City Pub. Schs. Bd. of Educ., 147 F.3d 1200, 1216 (10th Cir.1998) (holding that there was no school board liability where the “record indicates that Plaintiff did not himself inform the Board, either at the pretermination hearing or in writing, that he believed the recommendation was retaliatory”). Accordingly, the district court properly rejected Love-Lane’s First Amendment claim against the Board.
2.
We turn next to Love-Lane’s claims against Martin, brought against him in both his official and individual eapacities. The district court correctly held that the § 1983 claim against Martin in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative. Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); Hicks v. Halifax County Bd. of Educ., 93 F.Supp.2d 649, 667 (E.D.N.C.1999). As to the First Amendment claim against Martin under § 1983 in his individual capacity, Martin asserts a qualified immunity defense. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). We review de novo the district court’s determination that Martin is entitled to immunity, viewing the evidence in the light most favorable to Love-Lane. Gomez v. Atkins, 296 F.3d 253, 260-61 (4th Cir.2002). To determine whether Martin is entitled to qualified immunity, we must (1) identify the right allegedly violated, (2) consider whether at the time of the alleged violation the right was clearly established, and (3) determine whether a reasonable person in Martin’s position would have known that his actions would violate that right. Wilson v. Layne, 141 F.3d 111, 114-15 (4th Cir.1998). We conclude that Martin is not entitled to qualified immunity-
We have already covered the first step in Part III.A, supra, where we examined at length the right allegedly violated and observed that a public employee like Love-Lane has a First Amendment right to protest racially discriminatory practices at her agency without fear of retaliation. The more interesting question is the second, that is, whether the right was clearly established in 1997 and 1998 when Love-Lane was speaking out about race discrimination in discipline at Lewisville and Martin was allegedly retaliating against her. Pickering itself, decided thirty years before Love-Lane’s speech and demotion, *784 made clear that the core value of the Free Speech Clause of the First Amendment— “[t]he public interest in having free and unhindered debate on matters of public importance” — is so great that a public school “teacher’s exercise of [her] right to speak on issues of public importance may not furnish the basis for” an adverse employment decision against her. Pickering, 391 U.S. at 573, 574, 88 S.Ct. 1731. And Givhan, decided nearly twenty years before Love-Lane’s speech, made “clear that ... statements concerning the [s]ehool [district’s allegedly racially discriminatory practices involved a matter of public concern.” Connick, 461 U.S. at 146, 103 S.Ct. 1684. Thus, by 1997 it was clearly estafy lished that Love-Lane’s speech about race discrimination at Lewisville involved a matter of public concern. We have said on many occasions, however, that “only infrequently will it be ‘clearly established’ that a public employee’s speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a ‘particularized balancing’ [under Pickering] that is subtle, difficult to apply, and not yet well-defined.” DiMeglio, 45 F.3d at 806 (citation omitted). But we have never said “that a public employee’s right to speak on matters of public concern could never be clearly established.” Cromer, 88 F.3d at 1326. We did the Pickering balancing in part III.A, supra, and concluded that the subject of Love-Lane’s speech was of such heightened public concern that her interest (and the community’s) clearly outweighed her employer’s interest in efficiency. We noted there, in fact, that Martin admitted outright that Love-Lane’s speech did not jeopardize the welfare of the students at Lewisville. In light of this earlier discussion, we are persuaded that the interests to be balanced under Pickering weigh so heavily in Love-Lane’s favor that her right to speak about race discrimination in a public school was clearly established well before 1997 and 1998. See Cromer, 88 F.3d at 1327-29.
The final item in the qualified immunity inquiry is whether a reasonable person in Martin’s position would have known that demoting Love-Lane would have violated her right to speak out about race discrimination. We recognize that Martin, as school superintendent, has a very tough job — from handling difficult personnel matters, to satisfying parents, to providing quality education. A superintendent must therefore be accorded a great deal of leeway in managing a school system. Still, by 1997 ' a reasonable superintendent would surely be aware of a teacher’s right to speak out in opposition to race discrimination against elementary school children. And a reasonable superintendent would also know that retaliation taken in response to such speech is a First Amendment violation, especially when the speech was not disruptive to the point of jeopardizing the welfare of the children. In short, “[although it may be difficult to delimit exactly what conduct, in the abstract, violates a public employee’s first amendment rights,” demoting a public school teacher who speaks out against race discrimination in her school in a manner that does not jeopardize the welfare of the students “surely falls within the ambit.” Thompson v. City of Starkville, 901 F.2d 456, 470 (5th Cir.1990). Because case law had confirmed Love-Lane’s right to speak and because the Pickering balancing test tips decidedly in her favor, we hold that any reasonable school superintendent in Martin’s position in 1997 and 1998 would have realized that he would violate the Constitution if he, in fact, took adverse employment action against Love-Lane for speaking out about race discrimination at Lewisville Elementary School. We emphasize here that any liability on Martin’s part hinges on Love-Lane’s abili *785 ty to convince a jury that her reassignment was, in fact, retaliation for her exercise of protected speech. We emphasize, too, that we are not holding that every time a public official takes an adverse employment action against an employee who has complained of discrimination, the official risks a trial. See Cromer, 88 F.3d at 1330 n. 11. “Rather, this is the infrequent case where, after the Pickering balancing, the employee had the right to speak as a citizen about extensive and specific claims of racial discrimination.” Id. Here, Love-Lane assessed the situation at Lewisville for an entire school year, determined that the time-out room and other disciplinary practices discriminated against African American children in specific ways, and complained about this to school officials, at first privately and then more publicly. Surely Martin should have known that Love-Lane could not be disciplined for her speech on such a vital subject. For all of these reasons, we reverse the district court’s determination that Martin is entitled to qualified immunity with respect to Love-Lane’s free speech claim.
The dissent claims that in denying qualified immunity to Superintendent Martin, we “leave[] [top] school administrators in a sea of indeterminaney.” Post at 799. The majority asks, “What exactly are school administrators in Martin’s shoes henceforth supposed to do?” Post at 799. The answer is simple. They should do the same thing they were supposed to do before today: hear out, and not retaliate against, an assistant principal (or some other mid-level administrator) who raises concerns in a professional way about race discrimination in a public school. We should remember that mid-level school administrators, such as Love-Lane, have tough jobs too, for they are on the front lines. The doctrine of qualified immunity does not strip them of clearly established constitutional protections. The superintendent who appreciates this, as most surely do, will not be hindered by today’s decision.
C.
In an attempt to broaden its attack on our decision to allow Love-Lane’s First Amendment claim to proceed against Superintendent Martin, the dissent in its part IV discusses the importance of maintaining discipline in our public schools. See post at 800 (“Keeping order in our nation’s schools is among our most pressing educational concerns.”) This discussion actually confirms that Love-Lane was speaking out about a matter of substantial public concern when she questioned discriminatory practices in discipline at Lewisville. Indeed, Love-Lane’s speech was consistent with her interest in strong discipline. She believes “that children must be taught standards of behavior and they must be required to meet them. If children do not adhere to standards, then [she] believe[s] it is a teacher’s responsibility, as a trained professional, to confront the problem and deal with it, not pass it off or give up on the child.” J.A. 1204. According to Love-Lane, that is where Lewisville was failing. Too many teachers were using the timeout room to warehouse at-risk children who were often consigned there for minor infractions. Once there, the children, who were mostly African-American, received no instruction. Love-Lane used her First Amendment right to expose this practice.
The dissent also says that in allowing Love-Lane’s First Amendment claim to proceed, we are relying on litigation, not democratic discourse, to settle debates about disciplinary methods in public schools. See post at 800-801. The dissent is mistaken. We are simply recognizing that the First Amendment allows a school administrator or teacher to debate issues *786 of discipline within the parameters of Pickering. Here, the jury will not decide who had the best argument in the debate about discipline at Lewisville. It will decide only whether Love-Lane was demoted because she exercised her First Amendment right to voice concerns about disciplinary practices.
In its part V the dissent contends that our decision will drive good educators to private schools or other options. As we have said, the reasonable administrator who listens to the views of his subordinates and who does not retaliate when a troublesome issue is raised need not fear this opinion. But there is another point. The underprivileged fifth-grade student who is warehoused in a time-out room does not have the option of going to a private school or somewhere else. This student has been abandoned at the end of the road unless someone, like Love-Lane, is able to speak up for him.
IV.
Love-Lane contends that the district court erred in granting summary judgment to the Board and Martin on her claims that she was discriminated against because of her race when she was demoted. Love-Lane asserts her discrimination claims under three federal statutes, Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. Love-Lane proffers a circumstantial case, and the elements required to establish such a case are the same under all three statutes. See St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 506 n. 1, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Thompson, 312 F.3d at 649 n. 1. Specifically, the McDonnell Douglas framework, developed for Title VII, has been used to evaluate race discrimination claims under the three statutes. See McDonnell Douglas Corp. v. Given, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).
Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 makes it “an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race.” 42 U.S.C. § 2000e-2(a)(l). Under the McDonnell Douglas proof scheme the plaintiff must first establish a prima facie case of discrimination. See St. Mary’s Honor Ctr., 509 U.S. at 506, 113 S.Ct. 2742. Once the plaintiff establishes her prima facie case, the defendant must respond with evidence that it acted with a legitimate, non-discriminatory reason. See id. at 506-07,113 S.Ct. 2742. If the defendant makes this showing, the plaintiff must then present evidence to prove that the defendant’s articulated reason was pretext for unlawful discrimination. See id. at 507-08, 113 S.Ct. 2742. Although the evi-dentiary burdens shift back and forth under the McDonnell Douglas framework, “[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.” Tex. Dep’t of Cmty. Affairs v. Bur dine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). We conclude in this case, for the reasons set forth below, that while Love-Lane establishes a prima facie case of race discrimination, she does not proffer sufficient evidence of pretext to overcome the defendants’ legitimate, non-discriminatory reason for their decision to demote her. (To the extent that the Supreme Court’s recent decision in Desert Palace, Inc. v. Cos-ta, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), might change the role that the McDonnell Douglas burden-shift *787 ing framework plays in race discrimination cases, see Dare v. Wal-Mart Stores, Inc., 267 F.Supp.2d 987 (D.Minn. June 13, 2003), any change would not prevent the entry of summary judgment against Lane-Love on her race discrimination claims. As our discussion will show, Love-Lane does not “present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that ‘race ... was a motivating factor’ ” in her demotion. Desert Palace, 123 S.Ct. at 2155.)
A.
To establish her prima facie case that the defendants’ decision not to renew her administrative contract and to reassign her to a teaching position was discriminatory, Love-Lane must show that (1) she is a member of a protected class, (2) she was qualified for her job and her performance was satisfactory, (3) despite her qualifications she was removed from her assistant principal’s position and reassigned to a teaching position, and (4) the assistant principal’s position remained open to similarly qualified applicants after her reassignment. See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998); Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir.1992).
First, Love-Lane, who is African American, is a member of a protected class. See 42 U.S.C. § 2000e-2(a)(l). Second, Love-Lane’s evidence creates a genuine issue of fact as to whether her job performance was satisfactory at the time of her reassignment. There is no denying that by Love-Lane’s third year at Lewisville, her rapport with Blanchfield, as well as with several teachers, had deteriorated substantially, and her performance evaluations reflected that. Love-Lane offers evidence, however, that she continued to perform her job at a satisfactory level despite the problems with Blanchfield and certain teachers. While the defendants offer evidence that Martin and other top administrative officials independently evaluated Love-Lane’s work performance and found it to be substandard, Love-Lane’s evidence indicates that she was open to feedback and constructive criticism, made efforts to get along with Blanchfield and other staff members at Lewisville, and conducted herself overall in a professional and respectful manner. In fact, even on her last performance evaluation in the late spring of 1998, Love-Lane received ratings of standard or above in eight out of eleven evaluation categories. J.A. 292-96. She received a rating of “well above standard” for her work in planning the school program, which included assisting in developing the goals and objectives of the school, providing direction to staff, and contributing to the planning of the instructional program. J.A. 292. Love-Lane has thus created a genuine issue of material fact as to whether she was performing at a satisfactory level at the time of her reassignment. Third, we assume here, as did the district court, that Love-Lane’s removal from her administrative position and reassignment to a teaching position (a demotion) constitutes an adverse employment action for purposes of Title VII. Cf. Boone v. Goldin, 178 F.3d 253, 256 (4th Cir.1999) (noting that Title VII liability can arise from “reassignment with significantly different responsibilities”) (internal quotation marks and citation omitted). Fourth, neither side disputes that Love-Lane’s assistant principal position remained open to similarly qualified applicants after her reassignment. In sum, Love-Lane can establish each of the four elements of a prima facie case of race discrimination.
B.
Because Love-Lane has established a prima facie case of race discrimination, the *788 burden shifts to the defendants to offer a legitimate, nondiscriminatory reason for Love-Lane’s reassignment. O’Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). The defendants contend that Love-Lane was reassigned because she demonstrated a complete inability to work effectively under Blanchfield and because she failed to meet the expectations laid out for her by Martin in his October 1997 memo. (Martin’s memo warned Love-Lane that she had to respect the authority of her principal, register her disagreements in private, and rebuild trust. J.A. 979-80.) This explanation is sufficient to shift the burden to Love-Lane, who must show that “the legitimate reasons offered by the defendants] were not [their] true reasons, but were a pretext for discrimination.” Burdine, 450 U.S. at 253, 101 S.Ct. 1089.
Love-Lane fails to proffer sufficient evidence of pretext. We recognize, of course, that we held in part III that a reasonable jury could conclude that Love-Lane was retaliated against for speaking out on race issues in violation of her right to free speech. But the fact that Love-Lane has a viable free speech claim does not automatically mean that she has a viable race discrimination claim. To reach a jury on her race discrimination claims, Love-Lane must demonstrate — apart from demonstrating that she was reassigned in retaliation for her speech on race issues — that she was reassigned “because of’ her race. That, we conclude, she cannot do. Because, as we have already concluded, Love-Lane presents a genuine issue of material fact as to whether she was reassigned to a high school teaching position in retaliation for her vocal opposition to race discrimination, it follows that her evidence casts some doubt on the defendants’ assertion that they had legitimate, nondiscriminatory reasons, for reassigning her. But that doubt has nothing to do with Love-Lane’s-race. That is, none of Love-Lane’s evidence that she was reassigned in retaliation for her speech suggests that she was reassigned because of her race. Simply because Love-Lane presents evidence that the defendants’ justification for their adverse employment decision may be false does not mean that Love-Lane’s evidence demonstrates pretext -for race discrimination. “The ultimate question is whether the employer intentionally discriminated, and proof that the employer’s proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that [Love-Lane’s] proffered reason ... is correct.” Reeves, 530 U.S. at 146-47, 120 S.Ct. 2097 (internal quotation marks and citation omitted). It is not enough to disbelieve the defendants here; the fact-finder must believe Love-Lane’s explanation of intentional race discrimination. Id. at 147, 120 S.Ct. 2097. - We conclude that no rational jury could do • so based on the evidence in the record. Love-Lane’s evidence demonstrates that racial tensions were high at Lewisville during the Blanch-field administration and that Blanchfield herself made racially insensitive comments, though none directed at Love-Lane, on at least two occasions. Love-Lane did claim that Blanchfield’s reprimand following the June 1997 altercation was the result of racial bias. But an independent investigation into Love-Lane’s allegations uncovered no. evidence of racial bias or animus on Blanchfield’s part. Love-Lane, provides no further facts from which a jury could infer a discriminatory bias or animus on the part of Blanchfield, let alone on the part of Martin or the Board, that led to Love-Lane’s reassignment. Love-Lane -does not even allege that the decisions of Martin or the Board were motivated by l'acial bias or animus. Love-Lane’s evidence demonstrates only *789 that she and Blanehfield “did not see eye-to-eye.... [T]his showing of a difference of opinion, coupled with [Love-Lane’s] conclusory allegations of racism, cannot reasonably support the conclusion that [Love-Lane’s reassignment] was motivated by racial animus.” Hawkins v. Pepsi-Co, Inc., 203 F.3d 274, 281 (4th Cir.2000). Because, on the one side, there is substantial evidence that the defendants’ articulated justifications for Love-Lane’s dismissal were not pretext for race discrimination and, on the other side, there is only Love-Lane’s unsupported opinion that her reassignment was based on improper discriminatory intent, we cannot conclude that she has proffered evidence of pretext sufficient to withstand the defendants’ motion for summary judgment on the discrimination claims. Cf. id.; Williams v. Cerberonics, Inc., 871 F.2d 452, 456. (4th Cir.1989). We therefore affirm the award of summary judgment to the defendants on the federal race discrimination claims.
V.
Finally, we turn to Love-Lane’s claims against the Board and against Martin in his individual and official capacities for the violation of her right to free speech under Art. I, § 14 of the North Carolina Constitution and for race discrimination in violation of Art. I, § 19 of the North Carolina Constitution. Claims brought under the North Carolina Constitution may be asserted only against state officials acting in their official capacities. See DeWitt v. Mecklenburg County, 73 F.Supp.2d 589, 605-06 (W.D.N.C.1999) (citing Corum v. Univ. of N.C., 330 N.C. 761, 413 S.E.2d 276, 293 (1992)). Thus, the district court correctly dismissed the state constitutional claims against Martin in his individual capacity. In addition, a plaintiff whose rights under the North Carolina Constitution have been violated may pursue an action directly under the state constitution only if there is no other remedy under state law to redress the violation. Corum, 413 S.E.2d at 289. In this instance, Love-Lane could have brought an action in state court under N.C. Gen.Stat. § 115C-287.1(d) seeking review of the decisions of the Board and Martin. Because Love-Lane had this remedy available under North Carolina statute, she is barred from pursuing her state constitutional claims here. See Hughes v. Bedsole, 48 F.3d 1376, 1383 ,n. 6 (4th Cir.1995); Alt v. Parker, 112 N.C.App. 307, 435 S.E.2d 773, 779 (1993). Accordingly, we affirm the district court’s grant of summary judgment to the Board and Martin on Love-Lane’s state constitutional claims.
VI.
In sum, we vacate the district court’s grant of summary judgment to Martin in his individual capacity on Love-Lane’s First Amendment claim under 42 U.S.C. § 1983, and we remand for further proceedings on that claim. Otherwise, we affirm the district court’s grant of summary judgment to the Board and to Martin (in his official capacity only) on Love-Lane’s First Amendment claim under § 1983, to the Board and Martin on Love-Lane’s race discrimination claims, and to the Board and Martin on Love-Lane’s claims under the North Carolina Constitution. The dissent says that our decision to allow Love-Lane’s First Amendment claim to go forward will “undercut the standards that challenge students and the expectations that form the essence of education itself.” Post at 800-801. That is a solemn pronouncement, but is not true. The standards and expectations that shape public education are not undercut when we follow precedent, as we have today, and protect the right of a mid-level school administrator to speak out against race discrimination in her school.

*790
VACATED IN PART, AFFIRMED IN PART, AND REMANDED.